UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

D&G INC. d/b/a Gary's Foods, on behalf of
itself and all others similarly situated,

     Plaintiff,

     v.

SUPERVALU, INC. and C&S
WHOLESALE GROCERS, INC.

     Defendants.

Civil Action No. 08-C-761

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

1.     SUPERVALU, Inc. ("Supervalu") and C&S Wholesale Grocers, Inc. ("C&S") are the largest suppliers of grocery wholesale sales and services in the United States with combined annual wholesale revenues in excess of $28 billion.  Both Supervalu and C&S purchase consumer goods products from manufacturers and resell the products (and related services) to retailers.

2.     For approximately eight years, the Defendants competed vigorously against each other in New England, where C&S's wholesale business was concentrated.  In 2003, C&S began implementing a plan to enter Wisconsin, Iowa, and other states in the Midwest, an area dominated by Supervalu.  Rather than extend their competition to the Midwest or continue to compete in New England, the Defendants conspired to allocate territories:  Supervalu agreed to exit New England in return for C&S's commitment not to enter Wisconsin, Iowa, and other

1

states in the Midwest.  This scheme has caused substantial harm to retailers:  prices for wholesale sales and services have been inflated, fewer manufacturer discounts have been passed on to retailers, and the supply of wholesale sales and services has been artificially reduced.

3.     D&G Inc. d/b/a Gary's Foods, on behalf of itself and other similarly situated retailers, asserts claims against the Defendants for unjust enrichment and violations of the Sherman Act.

### The Parties

4.     Plaintiff D&G Inc. d/b/a Gary's Foods ("Gary's Foods") is an Iowa corporation with its principal place of business in Mount Vernon, Iowa.  Gary's Foods operates a retail grocery store, and purchased wholesale grocery products from Defendant Supervalu.

5.     Defendant SUPERVALU Inc. ("Supervalu") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. Supervalu competes in the grocery wholesale sales and services industry with revenues in 2007 in excess of $9 billion.  Supervalu is the second largest grocery wholesaler in the United States, supplying approximately 5,000 stores from distribution centers in 21 states.

6.     Defendant C&S Wholesale Grocers, Inc. ("C&S") is a Vermont corporation with its principal place of business in Keene, New Hampshire.  C&S competes in the grocery wholesale sales and services industry with revenues in 2007 in excess of $19 billion.  C&S is the largest grocery wholesaler in the United States, supplying grocery products to approximately 5,000 stores from distribution centers in twelve states.

### Jurisdiction, Venue, and Interstate Commerce

7.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation), because certain claims in

this action arise under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a)); and pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), because this action is brought as a class action, diversity of citizenship exists between the parties, and the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.  With respect to Plaintiff's common law claim, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22, and 26, in that Defendants inhabit, transact business, reside, are found, or have an agent in this district; a significant portion of the affected interstate trade and commerce described below has been carried out in this District; and a substantial part of the events giving rise to Plaintiff's claim occurred in this District.

9.      Defendants' anticompetitive activities were within the flow of and had a proximate, direct, substantial, and reasonably foreseeable effect on interstate commerce.

### The Grocery Wholesale Industry

10.    Consumer goods manufacturers produce products for sale to wholesalers. Wholesalers purchase products directly from manufacturers, store the products in distribution facilities, and then resell the products and related services to retailers like Gary's Foods.  Some wholesalers, including C&S and Supervalu, specialize in purchasing a broad array or "full line" of grocery products from manufacturers and reselling the products and related services to grocery retailers.  Full line grocery wholesalers stock tens of thousands of different products, including produce, meat, dairy products, deli products, bakery items, health and beauty aids, candy, and tobacco.

11.    Large grocery wholesalers that serve a broad geographic area typically offer a full

line of grocery products and services to retailers and typically operate several distribution facilities to serve retailers within the area.

*Manufacturer Discounts and Allowances Extended to Grocery Wholesalers*

12.     Consumer goods manufacturers compete vigorously in selling products to grocery wholesalers.  Competition occurs primarily on the basis of discounts, allowances, fees, and other economic concessions (collectively "discounts") given or made to wholesalers.

13.     Examples of discounts that certain wholesalers – particularly large wholesalers – receive from manufacturers include volume and other supply chain discounts, promotional discounts, spoilage or unsaleable allowances, marketing allowances, slotting fees, fixed fees, fees for agreeing not to divert products (i.e., sell products outside a wholesaler's normal chain of distribution), fees for agreeing not to forward buy products (i.e., purchase an excessive amount of product when on promotion by a consumer goods organization), and other types of fees or allowances.

14.     A wholesaler typically receives manufacturer discounts in three different ways. First, a discount may be reflected on an invoice sent by a manufacturer to a wholesaler in connection with a wholesaler's purchase of the product.  These discounts are referred to in the industry as "off invoice" discounts.  Second, a discount may be paid by check from a consumer goods manufacturer to the wholesaler and not reflected on the manufacturer's invoice to the wholesaler.  These discounts are referred to in the industry as "bill backs."  Third, a wholesaler may deduct a discount from the amount it owes a consumer goods manufacturer in connection with the purchase of product.  These discounts are referred to in the industry as "deductions."

15.     C&S and Supervalu – the largest grocery wholesalers in the industry – have been particularly aggressive and effective in securing discounts from manufacturers.  For example,

4

C&S requests that large manufacturers that sell product to the wholesaler participate in C&S's Crossroads program, a program designed to maximize manufacturer discounts to C&S. Manufacturers that do not participate in Crossroads typically suffer significant financial penalties from C&S in the form of deductions (with little or no basis) or other discounts imposed by C&S. For example, Cargill Inc. – a consumer goods manufacturer – chose not to participate in C&S's Crossroads program. As a consequence, C&S imposed roughly 60,000 deductions on Cargill in a single year. Upon information and belief, if Cargill had agreed to participate in Crossroads, Cargill's deductions would have been substantially less. Small manufacturers typically are not given an option to participate in Crossroads and typically pay (or otherwise acquiesce in giving) C&S substantial discounts.

*Competition Among Grocery Wholesalers*

16.    Grocery wholesalers compete for retail accounts principally on the basis of service and price. Prices that grocery wholesalers charge retailer customers include a price for the purchase of a product, transportation fees, fuel surcharges, warehouse fees, and other fees. As part of their price competition, grocery wholesalers also compete on the basis of discounts received from manufacturers that are passed on to retailers. In a competitive market, grocery wholesalers pass on to retailers discounts from manufacturers. The less competition a wholesaler faces, the fewer discounts a wholesaler will pass on to retailers.

17.    Large wholesalers that extract substantial discounts from manufacturers are uniquely positioned to compete aggressively on price for retail accounts. This is particularly true of C&S and Supervalu, which aggressively negotiate (or otherwise extract) substantial manufacturer discounts in the form of off-invoice discounts, billbacks, and deductions. Both C&S and Supervalu inform or otherwise commit to retailers that they are passing on to retailers

5

all (or many) of the discounts the wholesalers receive from manufacturers.  For example, in pricing its services to retailers, Supervalu informs retailers that Supervalu will use its "net product price" – the price Supervalu pays manufacturers for product net of discounts – as the baseline price to retailers on top of which Supervalu adds fees for services.

### Supervalu's Growth, Pricing, and Competition with C&S

18.     Supervalu's grocery wholesale business grew substantially in the 1990s and early 2000s.  Two competitive strategies generated this growth.

19.     First, Supervalu entered new geographic territories by acquiring wholesalers within the territories.  For example, in 1994, Supervalu entered New England by acquiring Sweet Life Foods, Inc., a grocery wholesaler that served hundreds of retailers in New England.  This acquisition gave Supervalu an efficient and immediate foothold in New England, as Supervalu acquired assets such as distribution facilities and other infrastructure to serve retailers in the region.  Following this acquisition, Supervalu competed aggressively in New England, an area that had been dominated by C&S.  Supervalu maintained large New England-based distribution facilities in Portland, Maine, Andover, Massachusetts, and Cranston, Rhode Island.

20.     Each year – from 1995 to 2003 – Supervalu took accounts and market share from C&S and grew its New England-based wholesale business.  By 2003, Supervalu had achieved sales of roughly $1.5 billion in New England.  While C&S remained the market leader in New England, competition from Supervalu was fierce and benefited retailers in the form of lower prices and improved services.

21.     Second, in an effort to improve revenues and margins, Supervalu implemented a new pricing program referred to as Activity Based Sell ("ABS").  In a 10-K filed with the SEC, Supervalu stated that, under ABS, it would charge retailers Supervalu's "net product price" (i.e.,

the price it paid manufacturers for product net of discounts) plus fees that would enable

Supervalu to "earn an adequate profit margin:"

> The Company has reexamined its pricing structure and has
> developed a new pricing approach to retailers called Activity
> Based Sell ("ABS"). The primary objectives of ABS are to reflect
> the net product price plus fees to recover the Company's cost to
> serve the retailer and to earn an adequate profit margin.

Supervalu's 1998 10-K.

22.     In the late 1990s, Supervalu began implementing its new pricing program, starting

in Wisconsin, Iowa, and other Midwestern states where Supervalu was the dominant grocery

wholesaler.  Retailers in Wisconsin, Iowa, and other Midwestern states immediately felt the

effects of ABS, as Supervalu's prices increased substantially.  Due to ABS, some retailers filed

for bankruptcy, and other retailers struggled to stay afloat.

23.     Following its price increase in the Midwest, Supervalu implemented ABS in its

other territories – except New England.  ABS pricing was too high for Supervalu to compete

effectively with C&S:  retailers would have left Supervalu for C&S, rendering the price increase

unprofitable.   Unlike in the Midwest, competition between C&S and Supervalu prevented

Supervalu's price increase.

### C&S's Planned Entry Into the Midwest

24.     Similar to Supervalu, in the early 2000s, C&S was looking to expand the

geographic territories in which it competed.  C&S's business was concentrated primarily in the

Northeast and the wholesaler sought growth opportunities in other geographies.  In 2003, an

attractive opportunity presented itself to C&S:  Fleming – a major full-line grocery wholesaler

with operations in many parts of the country – filed for bankruptcy and sought to sell its

wholesale operations, including its operations in the Midwest.   Fleming operated three

7

Midwestern distribution facilities, two of which were located in Wisconsin:  one in La Crosse

and one in Waukesha.  Fleming used these distribution facilities to serve hundreds of retailers in

Wisconsin, Iowa, and other Midwestern states.  Purchasing Fleming's Wisconsin (and related)

operations provided C&S an efficient means for entering the Midwest, as the La Crosse and

Waukesha distribution facilities could serve retailers throughout Wisconsin, Iowa, and other

Midwestern states.

   25.  C&S acted quickly.  In late June 2003 – roughly three months after Fleming filed

for bankruptcy – C&S announced that it would purchase Fleming's assets.  According to a C&S

executive named Mark Gross, Fleming's assets allowed C&S to expand its wholesale business

into new territories:

> The purchase of Fleming's wholesale grocery operations would
> allow us to expand our business into parts of the country where we
> do not presently operate.  We are excited about working with
> Fleming and its chain and independent supermarket customers in a
> mutually beneficial transition for all parties.

Fleming June 27, 2003 Form 8-K, p. 1 (quoting Mark Gross).

   26.  In order to retain the business of Fleming's retailers, C&S agreed to immediately

supply Fleming with consumer goods products so that Fleming had a sufficient inventory to

supply retailers.  C&S also began meeting with retailers to secure the retailers' business by

promising to offer wholesale sales and services at low prices.  C&S met with retailers in and

around La Crosse and, upon information and belief, retailers in and around Milwaukee.  Also as

part of its entry into the Midwest, and upon information and belief, C&S met with Fleming

employees working in the La Crosse and Waukesha distribution facilities to discuss the

employees transitioning to C&S to service retailers that purchased product from C&S.  Using the

Fleming distribution facilities in Wisconsin to enter the region, competition between C&S and

Supervalu in the Midwest had commenced.

27.     The prospect of C&S expanding into Wisconsin, Iowa, and other Midwestern states – where Supervalu's ABS pricing prevailed – was a substantial threat to Supervalu, particularly considering the intense price competition between the wholesalers in New England. When C&S announced that it would acquire Fleming's assets, Supervalu's stock declined ten percent on the news that "a stronger rival" was to acquire "an immediate stronghold in certain Midwest states, key areas for Supervalu:"

> Shares of Supervalu (SVU) tumbled 10 percent as investors worried that a stronger rival was stepping into the wholesale grocery picture. Bankrupt Fleming said Friday it was selling its wholesale business to privately held C&S, a large regional player in the grocery business. The sale gives C&S an immediate stronghold in certain Midwest states, key areas for Supervalu.

"Monday's Decliners," CBS MarketWatch.com (June 30, 2003).

### Supervalu and C&S's Market Allocation

28.     Faced with the prospect of competing against C&S in Wisconsin, Iowa, and other Midwestern states, Supervalu had one of two options:  either endure the competition, which would have substantially reduced prices to retailers, or seek an arrangement with C&S to eliminate competition between the wholesalers.

29.     Attempting to strike a competition-limiting arrangement with a competing wholesaler was not a novel concept to Supervalu.  At the very same time that C&S sought to enter the Midwest, Supervalu was negotiating an arrangement with Associated Grocers, Inc., a wholesaler that competed against Supervalu in the Pacific Northwest.  Negotiations between Supervalu and Associated Grocers abruptly ended when – contrary to the spirit of the parties' proposed arrangement – Associated Grocers won a contract to supply Supervalu's largest retailer

in the Pacific Northwest by proposing prices to the retailer that were $6 million a year less than Supervalu's prices.

30.     Supervalu subsequently sued Associated Grocers, claiming that Associated Grocers could not simultaneously compete while negotiating a competition-limiting arrangement with Supervalu.   Associated Grocers responded that Supervalu's position, if accepted, would violate the antitrust laws.   The Court agreed and held that any agreement not to compete between the wholesalers would be per se illegal under the antitrust laws:

> An agreement to notify one another of any intent to compete for each other's customers or to refrain from such competition altogether would have been a per se violation of the Sherman Act. See United States v. Topco Assocs., Inc., 405 U.S. 596, 612 (1972) (holding that territorial and customer allocation scheme among sellers of private label groceries violated antitrust laws).

*Supervalu Inc. v. Associated Grocers, Inc.*, Mem. of Law & Order, No. 04-2936 (D. Minn., Mar. 22, 2006).

31.     In an effort to conceal the anticompetitive nature of its dispute with Associated Grocers, Supervalu litigated its entire suit against Associated Grocers under seal.

32.     While Supervalu's efforts to eliminate Associated Grocers as a competitive threat were unsuccessful, Supervalu would find a more receptive partner to a per se illegal arrangement in C&S.   Shortly after C&S began its efforts to enter the Midwest, Supervalu and C&S started negotiating an arrangement that would prove devastating to retailers.

33.     Negotiations did not take long.   In August 2003, Supervalu and C&S entered a conspiracy to allocate markets and refrain from competing.   The co-conspirators agreed that Supervalu would exit New England in return for C&S's commitment not to enter the Midwest. Supervalu's New England retailers would be transferred to C&S, and C&S's Midwest retailers

(i.e., the retailers previously served by Fleming) would be transferred to Supervalu.

34.     The benefits to the co-conspirators of this arrangement were clear:  C&S would no longer face the fierce competition from Supervalu in New England, and Supervalu would ensure that the price competition that had prevailed in New England would not occur in Wisconsin, Iowa, and other Midwestern states, where Supervalu's ABS pricing prevailed.

35.     Supervalu and C&S publicly referred to their market allocation agreement as an "asset swap."  But this term proved to be a misnomer.  The co-conspirators did not swap bona fide assets that facilitated competition.  For example, distribution facilities and employees that run the facilities are primary assets of a grocery wholesaler that enable efficient and effective competition.  Rather than swapping these assets to facilitate competition, Supervalu and C&S immediately closed the three Midwest distribution facilities that C&S had purchased from Fleming and terminated over 1,000 employees.  In addition, shortly after the market allocation agreement was consummated, C&S closed the three New England distribution facilities previously owned by Supervalu and terminated over 1,000 employees.

36.     Rather than swapping bona fide assets, the co-conspirators simply traded retail accounts, eliminated competition between them, and substantially reduced the supply of wholesale sales and services in the Midwest and New England by closing distribution facilities that had served retailers for years.

37.     Reducing the supply of wholesale sales and services ensured that Supervalu and C&S could not efficiently re-enter the territories they agreed to exit:  the infrastructure that supported the co-conspirators' entry in the first place – i.e., the assets of Sweet Life and Fleming – no longer existed.  In addition to eliminating this capacity, upon information and belief, Supervalu and C&S also included a multi-year non-compete provision within the document

memorializing their market allocation.  Upon information and belief, this provision, which Supervalu and C&S never publicly disclosed, was necessary to ensure that Supervalu and C&S did not retain relationships with retailers seeking wholesale sales and services that potentially could be used to support re-entry into New England (for Supervalu) or the Midwest (for C&S), including the Wisconsin-based retailers that C&S had previously offered to supply and serve. Upon information and belief, in addition to the non-compete provision, Supervalu and C&S included other anticompetitive provisions with the agreement memorializing their market allocation and have entered other anticompetitive arrangements.

### *Anticompetitive Effects of the Co-Conspirators' Market Allocation*

38.     The anticompetitive effects of Supervalu's and C&S's market allocation have been substantial.  First, the market allocation caused retailers to pay higher prices for grocery wholesale sales and services than they would have paid if Supervalu and C&S had competed. For example, Supervalu ensured the continuation of ABS pricing in Wisconsin, Iowa, and other Midwestern states rather than face the aggressive price competition it experienced with C&S, and C&S did not face intense price competition in New England from the only other full-line grocery wholesaler capable of securing manufacturer discounts commensurate with C&S.

39.     The Defendants' higher prices created a windfall for Supervalu and C&S, both of which enjoyed substantial ill-gotten gains from their market allocation.  For example, in the year following the market allocation, Supervalu's wholesale sales volume declined by $100 million but its net income rose 26.2 percent, as the wholesaler sacrificed its less profitable sales volume in New England to increase profitable sales volume in Wisconsin, Iowa, and other Midwestern states.  Not surprisingly, Supervalu's president was hopeful that Supervalu could find other opportunities like the market allocation to improve the wholesaler's gross margins:

12

> Supervalu here said last year's asset swap with C&S Wholesale
> Grocers resulted in a sales decline of about $100 million for the
> second quarter ended Sept. 11, but net income rose 26.2%
> compared with the year-ago period.  Jeff Noddle, chairman,
> president and chief executive officer, pointed out that gross
> margins improved since the swap, "and we hope we can find more
> opportunities like that, though nothing is imminent."

"Supervalu's Sales Decline as Earnings Rise 26.2%," Supermarket News (Oct. 18, 2004).

40.     Second, the market allocation reduced the supply of grocery wholesale sales and services in the Midwest and New England.  Reducing the supply of grocery wholesale sales and services to retailers helped Supervalu and C&S maintain higher prices (as capacity was limited) and perpetuate their dominance in the Midwest and New England, as competing wholesalers no longer had an ability to efficiently enter territories through acquisition.  Further, by closing distribution facilities in the Midwest and New England, the co-conspirators increased transportation fees for a number of retailers that received product from the closed facilities.  Transportation fees are assessed to retailers based on the retailers' proximity to distribution facilities.  Supervalu and C&S closed six distribution facilities in the following locations:  La Crosse, Wisconsin, Waukesha, Wisconsin, Massillon, Ohio, Portland, Maine, Andover, Massachusetts, and Cranston, Rhode Island.  Nearby retailers that had received product from these facilities were forced to pay higher transportation fees following the closure of the facilities.  Because of higher costs and worsened service, the market allocation led some retailers to go out of business.

41.     Closing the distribution facilities also had a profound effect on the economies of the communities in which the facilities were located, as thousands of employees lost their jobs.  As a focal point for C&S's entry into the Midwest, the adverse economic effects of the Defendants' market allocation scheme were particularly pronounced in Wisconsin, which was

the only state to experience the loss of two distribution facilities.  The impact on Wisconsin communities caused by the closure of these facilities was not lost on Wisconsin retailers.  For example, the owner of a retailer based in La Crosse, Wisconsin – which lost roughly 375 jobs when the co-conspirators closed the distribution facility – described his emotions upon learning of the fate of the employees losing their jobs:

> [I]t's kind of like somebody in your family being ill.  You know they're going to pass away soon, but until it happens . . . It's so final now.  It's kind of a sickening feeling.

"Supervalu, C&S Confirm Shutdown," La Cross Tribune (Sept. 9, 2003) (quoting Dave Skogen, owner of Festival Foods stores).

42.     In addition to the impact on local economies, closing the Wisconsin distribution facilities also had a profound effect on retailers that could be supplied by these facilities (including retailers in Wisconsin and Iowa), as the lost wholesale capacity protected Supervalu from C&S's aggressive price competition, which would have lowered prices for grocery wholesale sales and services.

43.     Third, upon information and belief, the market allocation has limited competition between Supervalu and C&S in parts of the country outside of the Midwest and New England. For example, through its acquisition of Fleming, C&S entered California and the surrounding area.  In 2006, Supervalu purchased a major retailer with substantial operations in southern California.  Supervalu now maintains distribution facilities to serve its stores in southern California, but does not offer grocery wholesale sales and services to independent retailers in the area.  Upon information and belief, Supervalu has limited the geographic scope of its grocery wholesale sales and services for fear of disrupting the "competitive truce" it has reached with C&S.

14

*Fraudulent Concealment*

44.     Both Supervalu and C&S took steps to fraudulently conceal the anticompetitive nature and effects of their market allocation by concealing anticompetitive terms of the agreement memorializing their market allocation – including the Defendants' non-compete provision – and Supervalu concealing its dispute with Associated Grocers (which is relevant to Supervalu's anticompetitive intent in negotiating arrangements with competitors).

45.     Moreover, upon information and belief, both Supervalu and C&S actively took steps to conceal from retailers the extent to which the wholesalers were price gouging retailers. For example, following their market allocation, both Supervalu and C&S continued to aggressively negotiate and secure manufacturer discounts, and informed retailers that the wholesalers were passing the discounts through to the retailers.  The Defendants even allowed certain retailers to review invoices manufacturers sent the wholesalers, which the Defendants falsely claimed represented all (or the vast majority) of the manufacturer discounts.  But both C&S and Supervalu ensured that many manufacturer discounts were received in the form of bill backs and deductions that would not be reflected on invoices, and would remain concealed from retailers.

46.     In addition, without retailers' knowledge – upon information and belief – the Defendants limited the extent to which manufacturer promotions were passed through to retailers.  In order to encourage consumers to purchase their products, manufacturers typically promote products throughout a year for a limited period of time, such as three to four weeks. Manufacturers reduce prices for their products to encourage additional purchases of their product with the expectation that retailers will reduce the price of the manufacturers' product to consumers.  When manufacturers ran promotions on products for certain periods, the Defendants

15

would purchase substantial volumes of the manufacturers' products at the discounted promotional rates, but would only offer the promotional rates to retailers for periods of time substantially less than the manufacturers' promotional periods and falsely claim (or otherwise create the impression) that the manufacturers' promotions were limited to the time period that the Defendants were offering retailers the promotional discounts.  For example, a manufacturer may offer a promotional price on a product for a three-week period.  The Defendants would purchase a substantial volume of the product for this period, but only pass through a promotional price to retailers for a one-week period.

### *The Market for Full Line Grocery Wholesale Sales and Services*

47.     Supervalu and C&S compete in the market for full line grocery wholesale sales and services.  New England, including the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont, constitutes a separate geographic market or submarket within a broader United States geographic market for full line grocery wholesale sales and services.  C&S has market power in New England as reflected by its (a) market share, which, upon information and belief, exceeds 70 percent, (b) ability to reduce the supply of grocery wholesale sales and services in New England, and (c) ability to raise prices in New England.

48.     The Midwest, including the states of Illinois, Indiana, Iowa, Michigan, Minnesota, Ohio, and Wisconsin, constitutes a separate geographic market or submarket within a broader United States market for full line grocery wholesale sales and services.  Supervalu has market power in the Midwest as reflected by its (a) market share, which, upon information and belief, exceeds 70 percent, (b) ability to reduce the supply of grocery wholesale sales and services in the Midwest, and (c) ability to raise prices in the Midwest.

49.     Entry barriers exist in full-line grocery wholesale sales and services market(s) or

submarkets.  Entry requires substantial investments in resources and time to build distribution

facilities and services (including transportation services), hire and train employees, and invest

time and effort in securing retail accounts, including accounts subject to long-term exclusive

contracts.

50.     Because of these barriers to entry, many full line grocery wholesalers in the

United States, including C&S and Supervalu, have expanded into new territories by acquiring

other wholesalers, which requires substantial resources.  Since the 1990s, the grocery wholesale

industry has experienced substantial consolidation and limited opportunities currently exist for

substantial expansion through acquisition.  By closing the distribution facilities in the Midwest

and New England, Supervalu and C&S have increased barriers to entry into those territories.

### *Class Action Allegations*

51.     Plaintiff brings this action, pursuant to Fed. R. Civ. P. 23, on behalf of the

following class:

> All entities that have purchased products and/or services directly
> from the Defendants and have paid higher prices for grocery
> wholesale sales and/or services because of the Defendants' market
> allocation from September 8, 2003 through the present (and
> continuing until the effects of the Defendants' market allocation
> ceases).

52.     Excluded from this class are the Court and its officers, employees, and relatives;

Defendants, their parents, subsidiaries, affiliates, shareholders, and co-conspirators.

53.     Members of the class are so numerous and geographically dispersed that joinder is

impracticable.  While the exact number of class members is unknown to Plaintiff, it is believed

to be in the thousands.  Furthermore, the class is readily identifiable from information and

records in possession of the Defendants.

17

54.     Questions of law and fact common to members of the class predominate over questions, if any, that may affect only individual class members because Defendants have acted on grounds generally applicable to the class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Among those common questions of law or fact are:

a.   Whether the Defendants combined, agreed, and/or conspired to allocate markets and/or customers for grocery wholesale purchases and services;

b.   Whether Defendants fraudulently concealed their unlawful activities;

c.   Whether the contract, combination, and/or conspiracy caused the prices for grocery wholesale sales and services to be higher than they would have been in the absence of Defendants' conduct;

d.   Whether Defendants have been unjustly enriched by virtue of their anticompetitive conduct;

e.   Whether Defendants' conduct violates the Clayton and Sherman Acts;

f.   Whether Plaintiff and other class members have sustained or continue to sustain damages as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

g.   Whether Plaintiff and the other class members are entitled to an award of compensatory, treble, and/or punitive damages, and, if so, in what amount; and

h.   Whether Plaintiff and the other class members are entitled to injunctive or other equitable relief.

55.     Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff and all members of the class were damaged by the same wrongful conduct by the Defendants, *i.e.,* they have paid artificially inflated prices for grocery wholesale purchases and services as a result of Defendants' wrongful conduct.

56.     Plaintiff will fairly and adequately protect the interests of other class members because it has no interest that is antagonistic to or which conflicts with those of any other class

member, and Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature to represent Plaintiff and other members of the class.

57.     The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants.

58.     Defendants have acted or refused to act on grounds generally applicable to the class, thereby rendering injunctive or declaratory relief with respect to the class as a whole appropriate.

59.     This class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly-situated entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. The damages sustained by individual class members, although substantial, do not rise to the level where they would have a significant interest in controlling the prosecution of separate actions against these well-financed corporate defendants.

60.     The instant case will be eminently manageable as a class action.  Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### Count I:  Unjust Enrichment

61.     Plaintiff repeats and realleges the allegations in Paragraphs 1 – 60.

62.     Defendants have received measurable benefits from Plaintiff and the other class

members in the form of supracompetitive prices paid for grocery wholesale sale and services; and in the form of manufacturer discounts that the Defendants unjustly withheld from Plaintiff and the other class members.

63.     Defendants were aware that they were not legitimately entitled to these benefits, and their retention of these benefits resulted in and continues to result in inequity to Plaintiff and class members.

64.     Plaintiff and class members are entitled to restitution and disgorgement of Defendants' enrichment, benefits, and unjust enrichment as a result of the unlawful and/or wrongful conduct alleged herein, in an amount to be proven at trial.

## Count II:  Conspiracy to Restrain Trade in Violation of
## Sherman Act Section 1

65.     Plaintiff repeats and realleges the allegations in Paragraphs 1 – 64.

66.     Defendants have engaged in a combination or conspiracy in restraint of trade and commerce, the purpose and effect of which is to allocate markets and customers for, grocery wholesale sales and services.   The combination or conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants.

67.     Defendants' actions lack any legitimate business justification, and any purported business justifications are pretextual.

68.     Defendants' conduct substantially and adversely affects interstate commerce in the relevant markets.

69.     Defendants by and through their anticompetitive actions as outlined herein, have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

70.     As a direct and proximate result of Defendants' violations of the Sherman Act,

Plaintiff and class members have been harmed in an amount to be established at trial.

**Count III: Monopolization in Violation of Sherman Act Section 2 (Supervalu)**

71.     Plaintiff repeats and realleges the allegations in Paragraphs 1 – 70.

72.     Throughout the relevant time period, Defendant Supervalu possessed monopoly power in the market or submarket for full line grocery wholesale sales and services in the Midwest, including the states of Illinois, Indiana, Iowa, Michigan, Minnesota, Ohio, and Wisconsin.

73.     Through the anticompetitive conduct described herein, Supervalu has willfully acquired and/or maintained its monopoly power in this market or submarket.  Supervalu has acted with an intent to illegally acquire and/or maintain its monopoly, and its anticompetitive conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

74.     There are no legitimate business justifications for Supervalu's conduct, and any purported legitimate business justifications are merely pretextual.  Supervalu's acquisition or maintenance of its power is not the result of superior product, business acumen, or historic accident.

75.     Plaintiff and class members were injured in their business or property as a direct and foreseeable result of Supervalu's conduct in an amount to be proven at trial.

**Count IV: Monopolization in Violation of Sherman Act Section 2 (C&S)**

76.     Plaintiff repeats and realleges the allegations in Paragraphs 1 – 75.

77.     Throughout the relevant time period, Defendant C&S possessed monopoly power in the market or submarket for full line grocery wholesale sales and services in New England, including the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

78.     Through the anticompetitive conduct described herein, C&S has willfully acquired and/or maintained its monopoly power in this market or submarket.  C&S has acted with an intent to illegally acquire and/or maintain its monopoly, and its anticompetitive conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

79.     There are no legitimate business justifications for C&S's conduct, and any purported legitimate business justifications are merely pretextual.  C&S's acquisition or maintenance of its power is not the result of superior product, business acumen, or historic accident.

80.     Plaintiff and class members were injured in their business or property as a direct and foreseeable result of C&S's conduct in an amount to be proven at trial.

### Count V: Conspiracy to Monopolize in Violation of Sherman Act Section 2

81.     Plaintiff repeats and realleges the allegations in Paragraphs 1 – 80.

82.     During the relevant time period, Defendants combined or conspired to monopolize trade in the market or submarkets for full line grocery wholesale sales and services in the Midwest and New England.

83.     Defendants have willfully and knowingly sought to acquire and maintain monopoly power in the above-defined market or submarkets by the wrongful conduct alleged above.

84.     Defendants engaged in acts and conduct in furtherance of the combination or conspiracy that have diminished, and continue to diminish, competition in the relevant market or submarkets, to the detriment of Plaintiff and class members.

85.     The necessary and direct result of Defendants' wrongful conduct has been the expansion or maintenance of their combined monopoly position in the above-defined market or

submarkets.   Defendants' actions have affected an appreciable and substantial amount of interstate commerce.

86.   Defendants' actions are not based on any lawful market dominance and have no lawful business justification, and any purported business justifications are merely pretextual.

87.   As a direct and proximate result of Defendants' violations of Section 2 of the Sherman Act, Plaintiff and other members of the class have been harmed.

### Count VI: Attempted Monopolization in Violation of Sherman Act Section 2 (Supervalu)

88.   Plaintiff repeats and realleges the allegations in Paragraphs 1 – 87.

89.   Through the anticompetitive conduct described herein, Supervalu has willfully sought to acquire, with a dangerous probability of success, monopoly power in the Midwest market or submarket for full line grocery wholesale sales and services.  Supervalu has acted with an intent to illegally acquire a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

90.   There are no legitimate business justifications for Supervalu's conduct, and any purported legitimate business justifications are merely pretextual.

91.   Plaintiff and class members were injured in their business or property as a direct and foreseeable result of Supervalu's conduct in an amount to be proven at trial.

### VII: Attempted Monopolization in Violation of Sherman Act Section 2 (C&S)

92.   Plaintiff repeats and realleges the allegations in Paragraphs 1 – 91.

93.   Through the anticompetitive conduct described herein, C&S has willfully sought to acquire, with a dangerous probability of success, monopoly power in the New England market or submarket for full line grocery wholesale sales and services.  C&S has acted with an intent to illegally acquire a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

94.     There are no legitimate business justifications for C&S's conduct, and any purported legitimate business justifications are merely pretextual.

95.     Plaintiff and class members were injured in their business or property as a direct and foreseeable result of C&S's conduct in an amount to be proven at trial.

### JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, on its own behalf and on behalf of the Class, demands a trial by jury of all claims asserted in this Complaint so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of judgment:

a.     Certifying this action as a class action, appointing Plaintiff as Class Representative and their counsel as lead Class Counsel;

b.     Awarding Plaintiff its full monetary damages to be proven at trial;

c.     Awarding Plaintiff treble their monetary damages, pursuant to 15 U.S.C. § 15;

d.     Awarding Plaintiff pre-and post-judgment interest on their damages;

e.     Awarding Plaintiff the costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. § 15;

f.     Awarding Plaintiff the amount by which Defendants have been unjustly enriched;

g.     Awarding Plaintiff punitive damages in an amount to be determined;

h.     Awarding Plaintiff injunctive relief;

i.     Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated this 31st day of December, 2008

Daniel Kotchen (SBN 1029853)
Daniel Low
Kotchen & Low LLP
2300 M St., NW, Suite 800
Washington, DC 20037
(202) 416-1848 (Tel.)
(202) 280-1128 (Fax)

Counsel for Plaintiff