UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

D&G, INC. d/b/a Gary's Foods and
ROBERT WARREN WENTWORTH JR.,
INC. d/b/a Rangeley IGA, on behalf of
themselves and all others similarly
situated,

      Plaintiffs,

      v.

SUPERVALU INC. and C&S
WHOLESALE GROCERS, INC.,

      Defendants.

Civil Action No. 09cv983 PJS/AJB

CLASS ACTION

JURY TRIAL DEMANDED

**SECOND AMENDED CLASS ACTION COMPLAINT**

    1.    This is an antitrust case in which the two largest wholesale grocers in the

country, SuperValu Inc. ("SuperValu") and C&S Wholesale Grocers, Inc. ("C&S")

(collectively, "Defendants"), secretly agreed to allocate territories and customers by

agreeing not to compete with each other in their respective home markets: (1) the

Midwest, where SuperValu is headquartered and which it calls its "heartland operations,"

and (2) New England, where C&S is headquartered and its business is concentrated.

Prior to their agreement, SuperValu and C&S had competed against one another in New

England for many years.  In the summer of 2003, C&S for the first time acquired

distribution facilities in the Midwest and began to expand its business into the Midwest.[1]

2.      As a result of this new competition, in September 2003, Defendants entered into a written "Asset Exchange Agreement" whereby SuperValu acquired all of C&S' distribution facilities in the Midwest in exchange for C&S acquiring all of SuperValu's distribution facilities in New England.  (Although the existence of the "Asset Exchange Agreement" was made public, its terms were never disclosed.)  At or about the same time, Defendants also entered into an additional, secret written agreement that they would no longer compete with each other.  None of Defendants' disclosures regarding the "Asset Exchange Agreement" revealed the existence of their secret non-compete agreement.  Upon information and belief, Defendants' non-compete agreement was not disclosed to the Federal Trade Commission.  Plaintiffs first learned of this secret agreement between Defendants from a former SuperValu executive in or about November 2008, shortly before this lawsuit was filed.

3.      The "Asset Exchange Agreement" had no legitimate business purpose and was used by Defendants as a cover for their secret, illegal non-compete agreement allocating the New England market to C&S and the Midwest market to SuperValu. Defendants had no intention of operating the distribution facilities they exchanged with each other.  Tellingly, the very distribution facilities that SuperValu and C&S acquired

---

[1] C&S acquired its Midwest distribution facilities from Fleming Companies, a Midwest grocery wholesaler, pursuant to a July 7, 2003 Asset Purchase Agreement while Fleming was in bankruptcy.

from each other under the "Asset Exchange Agreement" were closed by each Defendant at or about the time they were acquired.

4.      Defendants' illegal territorial and customer allocation has caused substantial harm to competition.  As a result of Defendants' illegal agreement, prices for grocery wholesale goods and services purchased by Plaintiffs and members of the class have been artificially inflated and grocery wholesale goods and services capacity has been artificially reduced.

### The Parties

5.      Plaintiff D&G, Inc. d/b/a Gary's Foods ("Gary's Foods") is an Iowa corporation with its principal place of business in Mount Vernon, Iowa.  Gary's Foods operates a retail grocery store and purchased wholesale grocery products and related services from Defendant SuperValu during the Class Period (as defined below).

6.      Plaintiff Robert Warren Wentworth Jr., Inc. d/b/a Rangeley IGA ("Rangeley IGA") is a Maine corporation with its principal place of business in Rangeley, Maine.  Rangeley IGA operates a retail grocery store and purchased wholesale grocery products and related services from Defendants during the Class Period (as defined below).

7.      Defendant SuperValu is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  SuperValu competes in the grocery wholesale goods and services industry with revenues in 2008 in excess of $9 billion.  SuperValu is the second largest grocery wholesaler by dollar volume in the United States, supplying

approximately 5,000 stores from distribution centers in 21 states.

8.     Defendant C&S is a Vermont corporation with its principal place of business in Keene, New Hampshire.  C&S competes in the grocery wholesale goods and services industry with revenues in 2008 in excess of $19 billion.  C&S is the largest grocery wholesaler by dollar volume in the United States, supplying approximately 5,000 stores from distribution centers in 12 states.

### Jurisdiction, Venue and Interstate Commerce

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation), because certain claims in this action arise under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)); and pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), because this action is brought as a class action, diversity of citizenship exists between the parties, and the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

10.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. §§ 15 and 22 in that Defendants inhabit, transact business, reside, are found or have an agent in this district; a significant portion of the affected interstate trade and commerce described below has been carried out in this District; and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

11.     Defendants' anticompetitive activities were within the flow of and had a proximate, direct, substantial and reasonably foreseeable effect on interstate commerce.

### *The Grocery Wholesale Industry*

12.     Grocery wholesalers purchase products directly from consumer goods manufacturers, store the products in distribution facilities and then resell the products to retailers like Gary's Foods and Rangeley IGA.  Grocery wholesalers also provide related services such as transportation, administrative and other services.  Some wholesalers, including C&S and SuperValu, specialize in providing a "full line" of grocery products to retailers.  Full-line grocery wholesalers stock tens of thousands of different products, including produce, meat, dairy products, deli products, bakery items, health and beauty aids and candy.

13.     Large grocery wholesalers serving a broad geographic area generally offer a full line of grocery products and related services to retailers and operate several distribution facilities to serve retailers within that area.

14.     Grocery wholesalers compete for retail accounts principally on the basis of price and service.  Prices that grocery wholesalers charge retailer customers include a price for the purchase of a product, transportation fees, fuel surcharges, warehouse fees and other fees.

15.     Consumer goods manufacturers compete vigorously in selling products to grocery wholesalers.  Competition occurs primarily on the basis of discounts, allowances, fees, payments and other economic concessions (collectively "discounts") given or made to wholesalers.  These discounts can be reflected on manufacturer invoices to wholesalers, in wholesaler "bill backs" to manufacturers or through wholesaler

5

deductions.

16.    As the largest grocery wholesalers in the United States, C&S and SuperValu have been particularly aggressive and effective in securing discounts from manufacturers that are not available to smaller wholesalers.  For example, C&S requests that large manufacturers that sell product to the wholesaler participate in C&S' Crossroads program, a program designed to maximize manufacturer discounts to C&S. Manufacturers that do not participate in Crossroads typically suffer significant financial penalties from C&S in the form of deductions (with little or no basis) or other discounts imposed by C&S.

17.    Because of their ability to extract discounts from manufacturers not available to smaller wholesalers, C&S and SuperValu are uniquely positioned to compete aggressively on price for retail accounts.

### SuperValu's Growth, Pricing and Competition with C&S

18.    SuperValu's grocery wholesale business grew substantially in the 1990's and early 2000's.  Two business strategies generated this growth.

19.    First, SuperValu entered new geographic territories by acquiring wholesalers within those territories.  For example, in 1994, SuperValu entered New England by acquiring Sweet Life Foods, Inc., a grocery wholesaler that served hundreds of retailers in New England.  This acquisition gave SuperValu an efficient and immediate foothold in New England, as SuperValu acquired distribution facilities and other infrastructure to serve retailers in the region.  Following this acquisition, SuperValu

6

competed with C&S in New England, an area that had been dominated by C&S. SuperValu maintained large, New England-based distribution facilities in Portland, Maine, Andover, Massachusetts, and Cranston, Rhode Island.

20.     Each year – from 1995 to 2003 – SuperValu took accounts and market share from C&S and grew its New England-based grocery wholesale business.  By 2003, SuperValu had achieved sales of roughly $1.5 billion in New England.  While C&S remained the market leader in New England, competition from SuperValu benefited retailers in the form of lower prices and improved services.

21.     Second, in an effort to improve revenues and margins, in the late 1990's SuperValu implemented a new pricing approach it referred to as Activity Based Sell ("ABS").  Under ABS, SuperValu stated that it would charge retailers SuperValu's "net product price" (*i.e.*, the price SuperValu paid manufacturers for product net of discounts) plus fees that would enable SuperValu to "earn an adequate profit margin."  SuperValu 1998 10-K at 5.

22.     As SuperValu began implementing its new pricing program in the Midwest, where SuperValu was the dominant grocery wholesaler, SuperValu's prices increased substantially.

23.     SuperValu implemented ABS in its other territories – except New England. ABS pricing was too high for SuperValu to compete effectively with C&S.  Retailers would have left SuperValu for lower prices at C&S, rendering the ABS price increases unprofitable for SuperValu.  Unlike the Midwest, the presence of competition from C&S

7

in New England prevented SuperValu from implementing ABS pricing there.

### *C&S' Entry Into the Midwest*

24.     In the early 2000's, C&S was looking to expand the geographic territories in which it sold wholesale grocery products and related services.  C&S' business was concentrated primarily in New England and the wholesaler sought growth opportunities in other geographic areas.  In 2003, an attractive opportunity presented itself to C&S: Fleming Companies, Inc. ("Fleming"). – a major full-line grocery wholesaler with operations in many parts of the country – filed for bankruptcy and sought to sell its wholesale operations, including its operations in the Midwest.  Fleming operated three Midwestern distribution facilities, one in each of the following locations: La Crosse, Wisconsin, Waukesha, Wisconsin, and Massillon, Ohio.  Fleming used these distribution facilities to serve retailers throughout the Midwest.  Purchasing Fleming's Midwest distribution facilities provided C&S an efficient means for entering the Midwest.

25.     In late June 2003 – roughly three months after Fleming filed for bankruptcy – C&S announced that it would purchase Fleming's assets.  According to Mike Gross, the C&S Executive Vice President at that time, buying Fleming's assets allowed C&S to expand its grocery wholesale business into new territories:

> The purchase of Fleming's wholesale grocery operations would allow us to expand our business into parts of the country where we do not presently operate.  We are excited about working with Fleming and its chain and independent supermarket customers in a mutually beneficial transition for all parties.

8

Fleming's June 27, 2003 Form 8-K at 1 (quoting Mark Gross).

26.     C&S stated that it expected to operate Fleming's Wisconsin-based distribution facilities:

> Last week, C&S Executive Vice President Mark Gross told the Tribune his company expects to operate Fleming distribution facilities in La Crosse and Waukesha if its bid for Fleming's wholesale grocery business succeeds.

"Fleming Auction Moves Forward," La Crosse Tribune (July 19, 2003).

27.     In order to retain the business of Fleming's retailers, C&S agreed to immediately supply Fleming with consumer goods products so that Fleming had a sufficient inventory to supply retailers.  C&S also began meeting with retailers to secure the retailers' business by promising to offer wholesale goods and services at low prices. C&S met with retailers in and around La Crosse and retailers in and around Milwaukee. Also as part of its entry into the Midwest, C&S met with Fleming employees working in the La Crosse and Waukesha distribution facilities to discuss the employees transitioning to C&S to service retailers that purchased product from C&S.  Using the Fleming distribution facilities to enter the region, competition between C&S and SuperValu in the Midwest had commenced.

28.     C&S' expansion into the Midwest – where SuperValu's ABS pricing prevailed – was a substantial threat to SuperValu, particularly considering the intense price competition between the wholesalers in New England.  When C&S announced that it would acquire Fleming's assets, SuperValu's stock declined ten percent on the news

that "a stronger rival" was to acquire "an immediate stronghold in certain Midwest states,

key areas for SuperValu:"

> Shares of SuperValu (SVU) tumbled 10 percent as investors worried that a stronger rival was stepping into the wholesale grocery picture.  Bankrupt Fleming said Friday it was selling its wholesale business to privately held C&S, a large regional player in the grocery business.  The sale gives C&S an immediate stronghold in certain Midwest states, key areas for SuperValu.

"Monday's Decliners," CBS MarketWatch.com (June 30, 2003).

### *SuperValu and C&S' Conspiracy to Suppress Competition*

29.    Faced with the prospect of competing against C&S in the Midwest,

SuperValu had one of two options: either vigorously compete, which would have

substantially reduced prices to retailers, or conspire with C&S to eliminate competition

between the wholesalers.

30.    Attempting to strike a competition-limiting arrangement with a competing

wholesaler was not a novel concept to SuperValu.  At the very same time that C&S

sought to enter the Midwest, SuperValu was negotiating an arrangement with Associated

Grocers, Inc., a wholesaler that competed against SuperValu in the Pacific Northwest.

Negotiations between SuperValu and Associated Grocers abruptly ended when – contrary

to the spirit of the parties' proposed arrangement – Associated Grocers won a contract to

supply SuperValu's largest retailer in the Pacific Northwest by proposing prices to the

retailer that were $6 million-a-year less than SuperValu's prices.

31.    SuperValu subsequently sued Associated Grocers, claiming that Associated

10

Grocers could not simultaneously compete while negotiating a competition-limiting

arrangement with SuperValu.  Associated Grocers responded that SuperValu's position,

if accepted, would violate the antitrust laws.  The Court agreed and held that any

agreement not to compete between the wholesalers would be *per se* illegal under the

antitrust laws:

> An agreement to notify one another of any intent to compete
> for each other's customers or to refrain from such competition
> altogether would have been a per se violation of the Sherman
> Act.  See United States v. Topco Assocs., Inc., 405 U.S. 596,
> 612 (1972) (holding that territorial and customer allocation
> scheme among sellers of private label groceries violated
> antitrust laws).

*SuperValu Inc. v. Associated Grocers, Inc.*, Mem. of Law & Order, No. 04-2936 (D.

Minn. Mar. 22, 2006) (Davis, J.).

32.     While SuperValu's efforts to eliminate Associated Grocers as a competitive

threat were unsuccessful, SuperValu found a more receptive partner to a *per se* illegal

arrangement in C&S.  Shortly after C&S began its efforts to enter the Midwest,

SuperValu and C&S started negotiating an arrangement that would prove devastating to

retailers.

33.     Negotiations did not take long.  On or about September 13, 2003,

Defendants entered into a written "Asset Exchange Agreement" whereby SuperValu

acquired all of C&S' Midwest distribution facilities in exchange for C&S acquiring all of

SuperValu's New England distribution facilities.

34.     At or about the time that Defendants executed their "Asset Exchange

Agreement," Defendants also entered into a secret, written agreement not to compete with each other.  Defendants' secret non-compete agreement allocated the Midwest market to SuperValu and the New England market to C&S.  Defendants took affirmative steps to conceal their secret non-compete agreement, for example, by removing any mention of it in any of Defendants' disclosures regarding their "Asset Exchange Agreement."  Plaintiffs first learned of this secret, non-compete agreement between SuperValu and C&S in or about November 2008, shortly before this lawsuit was filed.

35.     Defendants' "Asset Exchange Agreement" had no legitimate business purpose.  Defendants entered into this agreement with the purpose and intent of closing the distribution facilities they were acquiring, thereby reducing capacity, raising prices and eliminating competition.  Within six months of entering into the "Asset Exchange Agreement," SuperValu and C&S had each closed the very distribution facilities they had obtained from the other.  SuperValu and C&S closed six distribution facilities in the following locations:  La Crosse, Wisconsin, Waukesha, Wisconsin, Massillon, Ohio, Portland, Maine, Andover, Massachusetts and Cranston, Rhode Island. (SuperValu made the decision to shut down the Midwest facilities it was acquiring even before the "Asset Exchange Agreement" closed.)  Over two thousand employees lost their jobs.

36.     Defendants' territorial and customer allocation was a naked restraint of trade.  Its purpose and effect was to limit or eliminate competition between Defendants in order to allow Defendants to charge supra-competitive prices in the Midwest and New England.

37.     Closing the former Fleming distribution facilities in the Midwest and the former SuperValu facilities in New England also helped ensure that SuperValu and C&S could not efficiently re-enter the territories they agreed to exit.

38.     Defendants actively used their secret territorial and customer allocation to harm retailers in a number of ways.  For example, Defendants charged retailers higher prices for grocery wholesale goods and services than they would have paid if SuperValu and C&S had competed.  SuperValu ensured the continuation of ABS pricing in the Midwest rather than having to engage in aggressive price competition like that which it experienced in competing with C&S in New England, and C&S no longer had to engage in intense price competition in New England with SuperValu.  Defendants' overcharges continue to the present and constitute independent acts injuring Plaintiffs and the class.

39.     Defendants' higher prices created a windfall for SuperValu and C&S, both of which enjoyed higher margins from their territorial and customer allocation than they would have earned had the Defendants competed in the Midwest and New England.  For example, in the year following their territorial and customer allocation, SuperValu's grocery wholesale sales volume declined by $100 million but its net income rose 26.2 percent, as the wholesaler sacrificed its less profitable sales volume in New England to increase profitable sales volume in the Midwest.  Not surprisingly, SuperValu's president was hopeful that SuperValu could find other opportunities like the territorial and customer allocation with C&S to improve SuperValu's gross margins:

SuperValu   here   said   last   year's   asset   swap   with   C&S

13

> Wholesale Grocers resulted in a sales decline of about $100 million for the second quarter ended Sept. 11, but net income rose 26.2% compared with the year-ago period. Jeff Noddle, chairman, president and chief executive officer, pointed out that gross margins improved since the swap, "and we hope we can find more opportunities like that, though nothing is imminent."

"SuperValu's Sales Decline as Earnings Rise 26.2%," Supermarket News (Oct. 18, 2004).

40.     Second, Defendants eliminated substantial capacity for grocery wholesale goods and services in the Midwest and New England by closing the distribution facilities. The closed distribution facilities were sold and redeveloped for use in non-grocery wholesale industries. This reduction in the supply of grocery wholesale goods and services to retailers helped SuperValu and C&S maintain higher prices (as capacity was limited) and perpetuate their dominance in the Midwest and New England, as competing wholesalers no longer had an ability to efficiently enter territories through acquisition.

41.     Further, by closing distribution facilities in the Midwest and New England, the co-conspirators increased transportation fees for a number of retailers that received product from the closed facilities. Transportation fees are generally assessed to retailers based on the retailers' proximity to distribution facilities. Nearby retailers that had received product from these facilities were forced to pay higher transportation fees following the closure of the facilities. Because of higher costs and worsened service, the territorial and customer allocation led some retailers to go out of business.

*Fraudulent Concealment*

42.     The running of any statute of limitations has been suspended with respect to any claims which Plaintiffs and members of the class or subclasses have sustained as a result of the unlawful contract, combination or conspiracy alleged herein by virtue of the federal doctrine of fraudulent concealment.

43.     Defendants fraudulently concealed the existence of their contract, combination or conspiracy to unlawfully suppress competition.  First, upon information and belief, Defendants affirmatively concealed their non-compete agreement from the Federal Trade Commission and did not disclose it in their Hart-Scott Rodino filings or otherwise.

44.     Second, Defendants acted to ensure that their secret non-compete agreement would be concealed from public disclosure by including a non-disclosure provision in their agreement(s) which prevented either Defendant from disclosing that they had agreed not to compete.

45.     Third, at or about the time Defendants entered into their territorial and customer allocation (specifically, for example, on August 10, 2003, September 8, 2003 and September 17, 2003), Defendants issued incomplete and misleading press releases that described an "asset exchange" between the organizations.  Nowhere in any of Defendants' press releases – or in any other way – did Defendants reveal that they had entered into an agreement not to compete, thereby allocating territories and customers to each other.

46.     Fourth, Defendants concealed that they exchanged their respective distribution facilities in the Midwest and New England for the express purpose of shutting them down and eliminating capacity from the markets.  For example, rather than acknowledging that SuperValu had made the decision to close the Midwest distribution facilities, SuperValu falsely stated that these facilities were being closed by Fleming.  *See* SuperValu Sept. 8, 2003 Press Release ("The three facilities located in La Crosse and Waukesha, Wisc., and Massillon, Ohio currently operated by Fleming will be closed by Fleming.").  It was not until after this lawsuit was filed that SuperValu admitted that SuperValu had in fact made the decision to close the Wisconsin facilities.  *See* Decl. of B. Bostwick, ¶ 13 ("The decision to close the distribution facilities located at Waukesha and La Crosse was made at SuperValu's Eden Prairie, Minnesota headquarters by SuperValu personnel located in Minnesota.").

47.     Fifth, Defendants represented publicly, both to customers and otherwise, that their pricing activities and business strategies were unilateral, rather than collusive, and based upon legitimate business purposes.  In making those false representations, Defendants misled Plaintiffs and members of the class or subclasses as to the existence and true collusive and coordinated nature of their agreement to suppress competition.

48.     Plaintiffs exercised due diligence in investigating the conduct alleged herein and in bringing this lawsuit.  Given the secret nature of Defendants' contract, combination or conspiracy to unlawfully suppress competition and Defendants' efforts to fraudulently conceal their unlawful conduct, Plaintiffs could not, and did not, discover

16

the existence of the Defendants' unlawful contract, combination or conspiracy until in or about November 2008, when a former SuperValu executive with knowledge of Defendants' agreement not to compete provided information concerning the existence of that agreement.  Shortly after learning this information, Plaintiffs filed this lawsuit.

49.     Any efforts to discover Defendants' unlawful conduct prior to November 2008 would have been (and were) futile given the secret nature of Defendants' agreement to suppress competition.  For example, from 2003 through 2005, Plaintiff Gary's Foods questioned the high prices it was paying to SuperValu for grocery wholesale services.  Concealing that it had entered into an agreement with its principal competitor (C&S) to suppress competition in the Midwest and charge supra-competitive prices for its products and services, SuperValu's response to Gary's Foods was:

> [If Gary's Foods] felt it could get lower prices from a supplier other than the SUPERVALU Northern Region it could and should have changed to that supplier.

Jan. 4, 2005 Letter from T. Darling to M. Roberts, p. 2 n. 2.

50.     Gary's Foods conducted due diligence to assess available competitive alternatives to SuperValu in the Midwest.  In conducting this due diligence, Gary's Foods did not discover – and was not told by SuperValu – that SuperValu and C&S had entered an agreement not to compete in the Midwest, which would have explained why C&S (which received substantial discounts from manufacturers and could therefore compete aggressively on price) was not a competitive alternative in the Midwest and how

17

SuperValu could get away with charging the supra-competitive prices it did.

### The Market for Full-Line Grocery Wholesale Goods and Services

51.    SuperValu and C&S compete in the market for full-line grocery wholesale goods and related services.  Defendants and other full-line wholesale grocery businesses who compete in the market for full-line grocery wholesale goods and services offer goods and services to retailers that are reasonably interchangeable with one another and that have a high cross-elasticity of demand with each other.

52.    Wholesale grocery businesses that offer only a partial line of goods and services are not reasonably interchangeable with those businesses that provide a full line of goods and services because full-line grocery wholesalers provide purchasers with certain economies of scale and scope that are not available from partial-line grocery wholesalers.  Specifically, by purchasing in bulk and taking advantage of a larger distribution network, full-line wholesalers are able to deliver a broader range and volume of goods and services more cheaply, quickly and efficiently than partial-line grocery wholesalers making substitution of partial-line wholesalers for full-line wholesalers unreasonable.  Grocery retailers generally strongly prefer dealing with full-line suppliers. Plaintiffs Gary's Foods and Rangeley IGA, for example, use full-line grocery wholesalers as their primary wholesalers and will not use partial-line wholesalers as primary wholesalers due to the disparity in the volume and range of products, services and efficiencies offered by the two different types of wholesalers.  Therefore, full-line grocery wholesale goods and services constitutes a separate product market that is

significantly different from, and appeals to buyers on a different basis than, partial-line grocery wholesale goods and services.

53.     New England constitutes a separate geographic market for full-line grocery wholesale goods and services.  The New England market includes approximately the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont ("New England"), where retailers can reasonably turn for alternative sources of full-line wholesale grocery products and services.  The distribution areas for the facilities in New England that were exchanged by Defendants and then closed are contained within this region and served each of the states included in this market.  Grocery retailers located in New England purchase the overwhelming majority of their wholesale grocery products and services from within New England.  Plaintiff Rangeley IGA, for example, has only purchased grocery wholesale products and services from wholesalers in New England (specifically, from wholesalers located in Maine, New Hampshire and Connecticut). Rangeley IGA has never purchased grocery wholesale products and services from wholesalers located outside of New England.

54.     The Midwest constitutes a separate geographic market for full-line grocery wholesale goods and services.  The Midwest market includes approximately the states of Illinois, Indiana, Iowa, Michigan, Minnesota, Ohio and Wisconsin ("the Midwest"), where retailers can reasonably turn for alternative sources of full-line wholesale grocery products and services.  The distribution areas for the facilities in the Midwest that were exchanged by Defendants and then closed are contained within this region and served

each of the states included in this market.  Grocery retailers located in the Midwest

purchase the overwhelming majority of their wholesale grocery products and services

from within the Midwest.  Plaintiff Gary Foods, for example, has only purchased grocery

wholesale products and services from wholesalers in the Midwest during the more than

30 years it has been in business (specifically, from wholesalers located in Minnesota,

Iowa and Illinois).  Gary Foods has never purchased grocery wholesale products and

services from wholesalers located outside of the Midwest.

      55.    At the time SuperValu and C&S entered their territorial and customer

allocation agreement, they had market power as reflected by (a) SuperValu having the

largest market shsare in the Midwest, more than three times the market share of the

second largest competitor in the Midwest; (b) SuperValu and C&S having the largest

combined market share in New England, more than eight times the market share of the

second largest competitor in New England; (b) Defendants' ability to reduce the supply

of grocery wholesale goods and services in the Midwest and New England, and (c) their

ability to price their products and/or services in the Midwest and New England above

competitive levels.

      56.    The territorial and customer allocation greatly enhanced the market power

of each Defendant in its respective geographic market, enabling it to secure its dominance

in that market.  For example, but for the territorial and customer allocation, C&S would

have been the second largest competitor in the Midwest after acquiring Fleming's

operations there.  By entering into the territorial and customer allocation with C&S,

however, SuperValu was able to avoid such competition.  Similarly, as a result of the

territorial and customer allocation, C&S nearly doubled its market share in New England,

ensuring its dominance there.

57.     High entry barriers exist in full-line grocery wholesale goods and services

markets.  Entry requires substantial investments in resources and time to, *inter alia*, (i)

build distribution facilities and services (including transportation services) that can

successfully compete with established distribution networks, (ii) hire and train

employees, and (iii) secure retail accounts, including accounts subject to long-term

exclusive contracts.

58.     Because of these barriers to entry, full-line grocery wholesalers in the

United States, including C&S and SuperValu, have expanded into new territories by

acquiring other wholesalers, which requires substantial resources.  Since the 1990's, the

grocery wholesale industry has experienced substantial consolidation and limited

opportunities currently exist for substantial expansion through acquisition.  By closing

the distribution facilities in the Midwest and New England, SuperValu and C&S have

increased barriers to entry into those territories.

### *Class Action Allegations*

59.     Plaintiffs bring this action, pursuant to Fed. R. Civ. P. 23, on behalf of a

class or subclasses of all entities located in the Midwest or New England that purchased

wholesale grocery products or related services directly from Defendants in the Midwest

or New England markets from September 8, 2003 through the present (and continuing

until the effects of Defendants' unlawful conduct ceases) (the "Class Period").  The

subclasses consist of direct purchasers located in (a) the Midwest and (b) New England,

respectively.

60.    Excluded from the class or subclasses are the Court and its officers,

employees and relatives, Defendants and their parents, subsidiaries, affiliates,

shareholders, employees and co-conspirators.

61.    Members of the class or subclasses are so numerous and geographically

dispersed that joinder is impracticable.  While the exact number of class or subclass

members is unknown to Plaintiffs, it is believed to be in the thousands.  Members of the

class or subclasses are readily identifiable from information and records in possession of

the Defendants.

62.    Questions of law and fact common to members of the class or subclasses

predominate over questions, if any, that may affect only individual class or subclass

members because Defendants have acted on grounds generally applicable to the class or

subclasses.  Such generally applicable conduct is inherent in Defendants' wrongful

conduct.  Common questions of law or fact include, but are not limited to:

      a.  Whether the Defendants combined, agreed or conspired to allocate
          territories for grocery wholesale goods and services in order to suppress
          competition and charge supra-competitive prices in the Midwest and
          New England;

      b.  Whether Defendants fraudulently concealed their unlawful activities;

      c.  Whether the contract, combination or conspiracy caused the prices for
          grocery wholesale goods and services to be higher than they would have

been in the absence of Defendants' conduct;

d.   Whether Defendants' conduct violates the Clayton and Sherman Acts;

e.   Whether Plaintiffs and other class or subclass members have sustained or continue to sustain damages as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

f.   Whether Plaintiffs and other class or subclass members are entitled to an award of compensatory, treble and/or punitive damages, and, if so, in what amount.

63.   Plaintiffs' claims are typical of the claims of the members of the class or subclasses.  Plaintiffs and all members of the class or subclasses were damaged by the same wrongful conduct by the Defendants, *i.e.,* they have paid artificially inflated prices for grocery wholesale goods and services as a result of Defendants' wrongful conduct. Plaintiff Gary's Foods is located in Iowa and is a member of the Midwest subclass. Plaintiff Rangeley IGA is located in Maine and is a member of the New England subclass.

64.   Plaintiffs will fairly and adequately protect the interests of other class and subclass members because they have no interest that is antagonistic to or which conflicts with those of any other class or subclass member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent Plaintiffs and other members of the class and subclasses.

65.   The prosecution of separate actions by individual members of the class or

subclasses would create the risk of inconsistent or varying adjudications with respect to individual members of the class or subclasses, which could establish incompatible standards of conduct for Defendants.

66.     This class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly-situated entities to prosecute their claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would produce.  The damages sustained by individual class or subclass members, although substantial, do not rise to the level where they would have a significant interest in controlling the prosecution of separate actions against these well-financed corporate defendants.

67.     The instant case will be eminently manageable as a class action.  Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## Count I:  Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act (*Per Se* Unlawful and Rule of Reason)

68.     Plaintiffs repeat and reallege the allegations in Paragraphs 1 – 67 above as if fully set forth herein.

69.     Defendants have entered a contract, combination or conspiracy in restraint of trade and commerce, the purpose and effect of which is to allocate territories for

grocery wholesale goods and services, to suppress competition and to allow Defendants to charge supra-competitive prices in the Midwest and New England.  The contract, combination or conspiracy consisted of continuing agreements, understandings and a concert of action between Defendants, in particular including Defendants' secret agreement not to compete.

70.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination or conspiracy were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

71.    The contract, combination or conspiracy is a naked restraint of trade that is illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1.

72.    Alternatively, Defendants' contract, combination or conspiracy constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason or "Quick Look" because:

    a.    Defendants' contract, combination or conspiracy constitutes a naked restraint of trade;

    b.    Defendants' contract, combination or conspiracy has caused substantial actual anticompetitive effects in the markets for full-line grocery wholesale goods and services, including, but not limited to:

        (1)    actual elimination of significant competition in the Midwest (*i.e.*, but for the territorial and customer allocation, C&S would have entered the market and assumed Fleming's place as the second largest competitor in the Midwest);

        (2)    actual elimination of significant competition in New England

(*i.e.*, but for the territorial and customer allocation, C&S would not have been able to eliminate its second largest competitor and nearly double its market share in New England); and

(3)     actual reduction of capacity and output resulting from Defendants' exchange and closing of facilities in their respective markets pursuant to their territorial and customer allocation agreement; and

c.     During the relevant time period, Defendants, individually and collectively, possessed market power in the markets for full-line grocery wholesale goods and services in the Midwest and New England.

73.     The territorial and customer allocation resulting from Defendants' contract, combination or conspiracy has no legitimate business purpose.  It achieves no legitimate efficiency or pro-competitive benefit to counterbalance the substantial anticompetitive effects it has caused in the markets for full-line grocery wholesale goods and services.

74.     Defendants' conduct substantially and adversely affects interstate commerce in the markets for full-line grocery wholesale goods and services

75.     As a direct and proximate result of Defendants' violations of the Sherman Act, Plaintiffs and each class or subclass member have been damaged (i) in their business or property by paying more for grocery wholesale goods and services than they would have but for Defendants' unlawful agreements; (ii) in an amount of ascertainable damages to be established at trial, pursuant to 15 U.S.C. § 15(a).  Plaintiffs' injury is of the type that the antitrust laws were intended to prevent.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs, on their own behalf and on behalf of the class or subclasses, demand a trial by jury of all claims asserted in this Second Amended Class Action Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment:

a.      Certifying this action as a class action with subclasses for each market affected by Defendants' unlawful conduct, and appointing Plaintiffs as respective class representatives and their counsel as lead class counsel;

b.      Awarding Plaintiffs and the class or subclasses full monetary damages to be proved at trial;

c.      Awarding Plaintiffs and the class or subclasses treble their monetary damages, pursuant to 15 U.S.C. § 15;

d.      Awarding Plaintiffs and the class or subclasses pre-and post-judgment interest on their damages as allowed by law;

e.      Awarding Plaintiffs and the class or subclasses the costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. § 15; and

f.      Awarding Plaintiffs and the class or subclasses such other and further relief as the Court deems just and proper.

Dated this 26th day of June, 2009.

    s/ Kevin M. Magnuson
Douglas A. Kelley (#0054525)
Kevin M. Magnuson (#306599)
Kelley & Wolter, P.A.
431 S. 7th Street, Suite 2530
Minneapolis, MN 55415
(612) 371-9090 (Tel.)
(612) 371-0574 (Fax)

Daniel A. Kotchen
Daniel L. Low
Kotchen & Low LLP
2300 M St., NW, Suite 800
Washington, DC 20037
(202) 416-1848 (Tel.)
(202) 280-1128 (Fax)

Richard B. Drubel
Kimberly H. Schultz
Boies, Schiller & Flexner LLP
26 South Main Street
Hanover, NH 03755
(603) 643-9090 (Tel.)
(603) 643-9010 (Fax)

Philip J. Iovieno
Anne M. Nardacci
Boies, Schiller & Flexner LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
(518) 434-0600 (Tel.)
(518) 434-0665 (Fax)

***Counsel for Plaintiffs***