# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re Wholesale Grocery Products
Antitrust Litigation

This Order Relates to All Actions

**MEMORANDUM OPINION
AND ORDER**
Court File No. 09-MD-2090 ADM/AJB

---

W. Joseph Bruckner, Esq., Elizabeth R. Odette, Esq., Lockridge, Grindal, Nauen, PLLP,
Minneapolis, MN; Kevin M. Magnuson, Esq., Kelley, Wolter & Scott, PA, Minneapolis, MN;
Richard B. Drubel, Esq., Kimberly H. Schultz, Esq., Matthew J. Henken, Esq., Boies, Schiller &
Flexner, LLP, Hanover, NH; Daniel A. Kotchen, Kotchen & Low, LLP, Washington, D.C.; Joel
C. Meredith, Esq., Daniel B. Allanoff, Esq., Meredith, Cohen, Greenfogel & Skirnick, PC,
Philadelphia, PA; and Edward T. Dangel, III, Esq., Dangel & Mattchen, LLP, Boston, MA,
appeared for and on behalf of Plaintiffs.

Stephen P. Safranski, Esq., K. Craig Wildfang, Esq., E. Casey Beckett, Esq., Robins, Kaplan,
Miller & Ciresi, LLP, Minneapolis, MN, appeared for and on behalf of Defendant SuperValu,
Inc.

Charles A. Loughlin, Esq., Howrey LLP, Washington, D.C.; and Todd A. Wind, Esq.,
Fredrikson & Byron, PA, Minneapolis, MN, appeared for and on behalf of Defendant C&S
Wholesale Grocers.

---

## I. INTRODUCTION

On April 22, 2010, the undersigned United States District Judge heard oral argument on

Defendants SuperValu Inc. ("SuperValu") and C&S Wholesale Grocers, Inc.'s ("C&S")

(collectively "Defendants") Motion to Dismiss [Docket No. 24]. Plaintiffs Blue Goose Super

Market, Inc. ("Blue Goose"), Charles W. Prather Company, Inc. d/b/a Prather's IGA

("Prather's"), D&G, Inc. d/b/a Gary's Foods ("Gary's Foods"), DeLuca's Corporation

("DeLuca's"), and Robert Warren Wentworth Jr., Inc. d/b/a Rangeley IGA's ("Rangeley IGA")

(collectively "Plaintiffs") Motion for Partial Summary Judgment [Docket No. 28] was argued at

the same hearing.   For the reasons set forth below, Defendants' Motion to Dismiss is denied and

Plaintiffs' Motion for Partial Summary Judgment is denied.

## II.  BACKGROUND

This is multidistrict litigation of four antitrust lawsuits against SuperValu and C&S, two

of the largest wholesale grocers in the United States.  Consol. Am. Class Action Compl.

("Compl.") [Docket No. 18] ¶ 1.  SuperValu's business is largely concentrated in the Midwest

while C&S's business is primarily in New England.  Id.  Plaintiffs operate retail grocery stores in

those regions and purchased wholesale grocery products and related services directly from

SuperValu and C&S.  Id. ¶¶ 5-9.

Plaintiffs' antitrust claims against Defendants stem from events that transpired after

Fleming Companies, also a wholesale grocer, filed for bankruptcy in 2003.  Id. ¶ 25.  In July of

that year, C&S agreed to purchase Fleming's wholesale grocery operations, including its three

distribution facilities in the Midwest.  Id. ¶¶ 25-26.  Shortly after the purchase, C&S and

SuperValu began negotiating an asset transfer.  See Beckett Decl. [Docket No. 26], Ex. C;

Bruckner Aff. [Docket No. 30], Ex. B (Asset Exchange Agreement).  On September 6, 2003,

Defendants entered into an Asset Exchange Agreement ("AEA" or "Agreement"), under which

C&S transferred to SuperValu the recently acquired Fleming Midwest operations, which

included three operating distribution facilities, retail supply agreements, notes, leases, franchise

agreements, and customer goodwill, and SuperValu transferred its New England operations,

which included three operating distribution facilities, a distribution facility SuperValu had closed

in 2001, retail supply agreements, notes, leases, franchise agreements, and customer goodwill, to

C&S.  Id. §§ 1.1, 1.3; Bruckner Aff., Exs. B-1, B-3.  At the time of the asset transfer, SuperValu

had been competing against C&S in New England for several years, but C&S had not been

competing against SuperValu in the Midwest. Compl. ¶ 21; Pls.' Mem. in Supp. of Mot. for Partial Summ. J. [Docket No. 29] at 3.

The Agreement also included non-compete provisions. C&S agreed (1) not to enter into a supply agreement or other arrangement to supply product to any of the Fleming customers it was transferring to SuperValu for the two years following the closing date of the AEA and (2) not to solicit any of those Fleming customers for the five years following the closing of the AEA. Asset Exchange Agreement §§ 5.8(a), 3.11. SuperValu made reciprocal two and five-year commitments regarding the customers served by the New England operations it was transferring to C&S. Id. §§ 4.9, 6.2. The former Fleming facilities in the Midwest acquired by SuperValu were closed shortly after the closing of the Agreement, and C&S closed the New England facilities it had acquired from SuperValu in the spring of 2004. Compl. ¶¶ 1, 37; Beckett Decl., Ex. I; Bruckner Aff., Ex. G.

On December 31, 2008, the first of the four lawsuits that have been consolidated for this multidistrict litigation was filed. Plaintiffs claim that Defendants violated section 1 of the Sherman Act, 15 U.S.C. § 1, by executing the AEA, which they allege "had no legitimate business purpose and was simply a sham transaction by Defendants to conceal their secret, illegal non-compete agreement allocating the New England market and customers to C&S and the Midwest market and customers to SuperValu." Compl. ¶ 37. Plaintiffs assert that Defendants' Agreement amounts to a "restraint of trade and commerce, the purpose and effect of which is to allocate customers and territories for full-line grocery wholesale goods and services, to suppress competition and allow Defendants to charge supra-competitive prices in the Midwest and New England." Id. ¶ 76. Plaintiffs allege injury by paying supra-competitive prices for wholesale groceries and related services from Defendants.

3

# III.  DISCUSSION

## A.     Defendants' Motion to Dismiss

Defendants move to dismiss the sole count of Plaintiffs' Complaint, which asserts claims

for treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, for alleged violations of

section 1 of the Sherman Act.  Rule 12 of the Federal Rules of Civil Procedure provides that a

party may move to dismiss a complaint for failure to state a claim upon which relief can be

granted.  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, the pleadings are

construed in the light most favorable to the nonmoving party, and the facts alleged in the

complaint must be taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v.

Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the

sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F.

Supp. at 880.

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "shall contain a short

and plain statement of the claim showing that the pleader is entitled to relief."  A pleading must

contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw a reasonable inference that the defendant is liable

for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Determining

whether a complaint states a plausible claim for relief is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  Id.  "But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but not 'shown'—'that the pleader is entitled to relief.'"  Id. (quoting

Fed. R. Civ. P. 8(a)(2)).

## 1.    Statute of Limitations

Defendants' first asserted ground for dismissal is that Plaintiffs' antitrust claims are time barred.  "Actions seeking damages pursuant to section 4 of the Clayton Act are subject to the four-year statute of limitations provided in section 4B of the Clayton Act, 15 U.S.C. § 15b." Little Rock Cardiology Clinic, P.A. v. Baptist Health, 573 F. Supp. 2d 1125, 1132 (E.D. Ark. 2008).  The earliest of the four lawsuits was filed on December 31, 2008, and, thus, Defendants argue Plaintiffs are time barred from asserting any antitrust claims that accrued prior to December 31, 2004.  Because Defendants executed the AEA in September 2003 and completed their closures in the spring of 2004, Defendants conclude, Plaintiffs' antitrust claims accrued well before December 31, 2004.  Plaintiffs respond that their claims are not time barred because (1) the fraudulent concealment doctrine tolled the limitations period and (2) the continuing violation doctrine restarted the limitations period with each overt act—i.e., each instance of Defendants charging supra-competitive prices.

### a.    Fraudulent Concealment

Plaintiffs allege that Defendants concealed the existence of their unlawful market and customer allocation agreement from its inception, thus tolling the entirety of the four-year statute of limitations until November 2008 when the alleged conspiracy was discovered by Plaintiffs' counsel.  Compl. ¶¶ 44-50.  "The general doctrine that the statute of limitation does not run while the defendant's offense is 'fraudulently concealed' has been adopted in antitrust litigation."  II Phillip Areeda & Herbert Hovencamp, Antitrust Law ¶ 320e (3d ed. 2007); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1051 (8th Cir. 2000) ("The statue can be tolled under certain circumstances, such as where a defendant has engaged in fraudulent concealment.").  To toll the statute of limitations based on fraudulent concealment, Plaintiffs

must prove that (1) Defendants concealed Plaintiffs' cause of action, (2) Plaintiffs failed to discover the cause of action, and (3) Plaintiffs exercised due diligence in attempting to discover the claim.  In re Milk Prods. Antitrust Litig., 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997).

The parties disagree over the standard to be applied in determining whether Plaintiffs have satisfied the first requirement of fraudulent concealment.  Defendants contend that there must be an affirmative act that is separate and apart from the acts creating the alleged cause of action and that Plaintiffs have failed to allege any such act.  See In re Monosodium Glutamate Antitrust Litigation, No. CIV. 00MDL1328PAM, 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003) (holding that "[f]raudulent concealment of a conspiracy encompasses something more than the acts involved in the conspiracy itself, which is by nature a crime of secrecy and cover-up" and that fraudulent concealment instead requires "acts, other than the acts constituting the conspiracy, that demonstrate fraudulent concealment of that conspiracy").  Plaintiffs respond that fraudulent concealment is not limited to affirmative acts separate and apart from the conspiracy itself but also is established if the violation was self-concealing in nature.  See United Power Ass'n, Inc. v. L.K. Comstock & Co., 1992 WL 402906, at *6 (D. Minn. Oct. 27, 1992) (citing cases).[1]

Deciding the correct standard for the first requirement is not necessary because, the Court concludes, Plaintiffs have failed to exercise due diligence in attempting to discover their claims and, therefore, fail to satisfy the third requirement of a fraudulent concealment claim.  When

---

[1] A a third, intermediary standard exists in addition to the "separate and apart" standard urged by Defendants and the "self-concealing" standard urged by Plaintiffs.  See Supermarket of Marlington, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 122 (4th Cir. 1995).  Under that "affirmative acts" standard, "a plaintiff must prove that the defendants affirmatively acted to conceal their antitrust violations, but the plaintiff's proof may include acts of concealment involved in the antitrust violation itself."  Id.

Plaintiffs questioned Defendants about the price increases, material information underlying the antitrust claims was available. There was publicly available information that Defendants had agreed to an AEA to transfer all of SuperValu's New England facilities and customer accounts to C&S in exchange for C&S transferring all of its Midwest facilities and customer supply agreements. <u>See</u>, <u>e.g.</u>, Becket Decl., Exs. D, E, F, J, L, O. The closure of the facilities following the execution of the AEA also was publicly known. <u>See</u>, <u>e.g.</u>, <u>id.</u>, Exs. J, K, L, M, N. Plaintiffs argue that "[t]he mere fact that both Defendants withdrew from each other's markets is not necessarily an illegal territorial allocation, because each Defendant may still be free to re-enter." Pls.' Mem. in Opp'n to Mot. to Dismiss [Docket No. 53] at 33. While that may be, the events that had transpired, culminating in the facility closures completed by the spring of 2004, certainly should have alerted Plaintiffs that Defendants' agreement could have the effect of allocating markets, territories, or customers, which might in turn lead to loss in competition. Indeed, when alleged price increases were implemented shortly after Defendants' exit from each other's markets, a serious concern should have arisen that the price increases might be related to the asset exchange.

Plaintiffs insist they did not discover, nor could they have discovered, the antitrust causes of action until November 2008 when Plaintiffs' counsel learned from a former SuperValu executive the secret terms of the covenant not to compete included in the AEA. In further support of the claim that they could not have made the discovery earlier, Plaintiffs argue that when Gary's Foods contacted SuperValu as early as 2004 and 2005 to question the high prices, SuperValu did not disclose that it and C&S "had entered an agreement not to compete in the Midwest, which would have explained why C&S . . . was not a competitive alternative in the Midwest and how SuperValu could get away with charging the supra-competitive prices it did."

Compl. ¶¶ 51-52.  Similarly, in the same time period, DeLuca's questioned C&S about high prices, and C&S responded that the increased prices were caused by unavoidable business conditions rather than disclosing that it had entered into a non-compete agreement with SuperValu, "which would have explained why SuperValu . . . was not a competitive alternative in New England and how C&S could get away with charging the supra-competitive prices it did." Id. ¶¶ 53-54.

Plaintiffs' position is unrealistic and untenable.  In essence, their argument is that Defendants' responses to customer inquiries about being charged higher prices—a relatively routine dialogue in the conduct of business—did not and could not put Plaintiffs on notice of their antitrust claims because Defendants did not explicitly admit the alleged anticompetitive foundation and motive behind the price increases.  As one court aptly observed in responding to a similar argument, "[t]o permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct upon this sort of timid inquiry would effectively nullify the statute of limitations in these cases.  It can hardly be imagined that illegal activities would ever be so gratuitously revealed." Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp., 828 F.2d 211, 218-19 (4th Cir. 1987).

The publicly available information coupled with the events that had transpired should have allowed Plaintiffs to "put two and two together."  The AEA was executed, Defendants exited each others' markets and, according to the allegations of the Complaint, Plaintiffs then began almost immediately experiencing higher prices.  In short, the necessary information suggesting Defendants' potential increased market power gained through the AEA and of their use of that power to "charge supra-competitive prices" was available to Plaintiffs. Cf. Hamilton County Bd. of Comm'rs v. Nat'l Football League, 491 F.3d 310, 315 (6th Cir. 2007) ("[T]he

County well understood the material facts underlying its antitrust claim: evidence of the NFL's potential monopoly power and its use of that power . . . .").

Having knowledge of information and activities that "would create notice and 'excite attention'" required Plaintiffs to inquire, and "merely asserting that they have diligently pursued their claims is not a sufficient allegation." Milk Prods., 84 F. Supp. 2d at 1024. Plaintiffs must show that they were reasonably diligent in attempting to discover the existence of the underlying conspiracy. See Monosodium Glutamate, 2003 WL 297287, at *3 (citing Klehr v. A.O. Smith Corp., 521 U.S. 179,194-95 (1997)). Plaintiffs allege in non-specific, conclusory fashion that their inquiries about higher prices on several occasions between 2003 and 2005 show that they were reasonably diligent. However, Plaintiffs fail to allege the specific questions posed in those inquiries or that Plaintiffs ever *pursued* their inquiries further after receiving SuperValu's response that "if [Gary's Foods] felt it could get lower prices from a supplier other than [SuperValu] it could and should have changed to that supplier" or C&S's response to DeLuca's that the prices were due to "unavoidable business conditions." Compl. ¶¶ 51-54. Nor is it alleged that any Plaintiff requested an explanation and supporting information from Defendants for the higher prices. See Hinds County, Miss. v. Wachovia Bank N.A., 620 F. Supp. 2d 499, 521 (S.D.N.Y. 2009) (holding that due diligence is not adequately pleaded when a plaintiff fails to make allegations of "'specific inquiries [or to] detail when such inquiries were made, to whom, regarding what, and with what response.'") (quoting In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998)). Importantly, given the nature of the conspiracy alleged by Plaintiffs' antitrust claims, there are no allegations that any plaintiff ever contacted either SuperValu or C&S to ask them why the companies had withdrawn from the New England and Midwest markets, respectively; rather, they asked only about the increase in prices. Thus, the

allegations here are in stark contrast to <u>Heaven & Earth, Inc. v. Wyman Properties Limited</u> <u>Partnership</u>, where the antitrust plaintiff went beyond merely questioning the defendant about higher prices and requested additional information supporting the defendant's claimed reasons for the higher prices. 2003 WL 22680935, at *2, 6 (D. Minn. Oct. 21, 2003).

The Court concludes that the mere questioning of the higher prices on several occasions fails to show due diligence in attempting to discover the antitrust claims. Accordingly, the fraudulent concealment doctrine does not operate to toll the statute of limitations.

### b.      Continuing Violation

Plaintiffs next argue they have alleged facts to show a continuing violation by Defendants. In <u>Klehr</u>, the Supreme Court explained that under the continuing violation doctrine, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." 521 U.S. at 189 (quotation omitted). In the context of an alleged conspiracy, each time a plaintiff is injured by an act of the defendants, a cause of action accrues and the statute of limitations runs from the commission of the act, allowing the plaintiff to recover for the damages from that act. <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 328 (1971). "The typical antitrust continuing violation occurs in a price-fixing conspiracy, actionable under Section 1 of the Sherman Act . . . when conspirators continue to meet to fine-tune their cartel agreement." <u>Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.</u>, 392 F.3d 265, 269 (8th Cir. 2004). To trigger the continuing violations doctrine, a new overt act "must be more than the unabated inertial consequences of the initial violation." <u>Id.</u> at 270. Rather, the act must be a new and independent act that is not merely a reaffirmation of a previous act, and it must inflict new and accumulating injury on the plaintiff. <u>Varner v. Peterson Farms</u>, 371 F.3d

1011, 1019 (8th Cir. 2004); see also Concord Boat, 207 F.3d at 1052 (holding that "acts that simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations.") (quotation omitted).

Defendants argue that Plaintiffs have alleged no new, independent acts within the limitations period. Defendants reason that the higher prices claimed to be a result of a loss of competition are the effects of the allegedly unlawful market and customer allocation, not overt acts that restart the statute of limitations. Thus, they contend, the continuing violations doctrine does not apply. Plaintiffs respond that the overt acts they have alleged (charging supra-competitive prices) were not the natural consequence of the conspiracy to allocate and were not necessarily contemplated by the terms of Defendants' Agreement. Accordingly, Plaintiffs conclude that the continuing violation doctrine applies.

In Midwestern Machinery, implementing the anticompetitive policies at issue—a merger between airlines challenged as substantially lessening competition and having the tendency to create a monopoly, in violation of section 7 of the Clayton Act, 15 U.S.C. § 18—required no new, independent actions to be taken to realize an anticompetitive benefit, and, thus, implementation amounted only to a reaffirmation of the adoption of the previous policies. 392 F.3d at 269-72. The alleged anticompetitve conspiracy in this case to allocate the Midwest market and customers to SuperValu and the New England market and customers to C&S.[2]

---

[2] As noted above, the typical continuing violation occurs in a price-fixing conspiracy. Conceptually, price-fixing conspiracies and market allocation conspiracies are similar: "The analogy between price-fixing and division of markets is compelling. It would be a strange interpretation of antitrust law that forbade competitors to agree on [prices], thus eliminating price competition among them, but allowed them to divide markets, thus eliminating all competition among them." Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 65 F.3d 1406,1415 (7th Cir. 1995). Given the similarities, the continuing violations doctrine can apply in a market allocation conspiracy. See Columbia Steel Casting Co., Inc. v. Portland Gen.

However, realizing an anticompetitive benefit from the alleged conspiracy required SuperValu and C&S to undertake new and independent acts of charging supra-competitive prices that were not expressly contemplated by the terms of the Agreement.  Contra In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 228-29 (E.D.N.Y. 2003) (concluding that acts taken subsequent to the execution of an agreement were not continuing violations when the acts were "contemplated by, and needed to implement, the fixed terms of the challenged agreements").  Thus, the alleged charging of supra-competitive prices amounts to more than the mere reaffirmation of the prior market/customer allocation.  Closing the exchanged facilities effectuated the alleged allocation conspiracy; charging supra-competitive prices, however, is not effectuated if and until Defendants raise their prices.

Defendants characterize the diminished competition caused by SuperValu's continued absence from New England and C&S's continued absence from the Midwest and the alleged price increases as the "unabated inertial consequences" or "detrimental effects" of the alleged allocation conspiracy.  Defs.' Reply Mem. in Supp. of Mot. to Dismiss [Docket No. 56] at 3. While the failure or refusal to reenter the markets is appropriately characterized as an inertial consequence, the alleged charging of supra-competitive prices is not a mere detrimental effect. On the contrary, price increases are new and independent acts.

Defendants attempt to equate their transaction to a merger or total acquisition for the purpose of then arguing that ongoing, post-acquisition sales are merely reaffirmations of the

---

Elec. Co., 111 F.3d 1427, 1444 (9th Cir. 1996) (holding, in an antitrust action alleging an agreement between two utility companies to a market allocation, that the utility company's refusal to allow a customer in its territory to have its power needs supplied by the other utility company was an overt act that restarted the statute of limitations under the continuing violations doctrine).

merger or acquisition rather than independent predicate acts.  See Defs.' Mem. in Supp. of Mot.

to Dismiss [Docket No. 25] at 19-21.  The attempt is unavailing for several reasons.  First, the

allegations of the Complaint, if true, are that Defendants have taken on a use of their acquisition

of each other's assets through the Agreement "in a way that is not inherent in the acquisition

itself."  Areeda, supra, ¶ 320c5.  Professors Areeda and Hovencamp explain:

> [S]uppose that a merger gave a firm the structural power to engage
> in predatory pricing.  A damages action challenging such a merger
> would fail as long as predation were merely possible or even
> likely.  As a result, the statute of limitation would not run on such
> a damage claim.  However, once unlawful predation began and the
> plaintiff could show that the merger facilitated the predation, then
> the statute of limitation would not bar a challenge to the merger
> itself, in addition to the predatory pricing suit.

Id.[3]  Similarly, the Agreement in this case resulted in an allegedly unlawful exchange of

facilities.  The exchange itself did not injure Plaintiffs; rather, any injury to Plaintiffs occurred

when Defendants began to charge supra-competitive prices.

Second, the transaction at issue in cases such as Midwestern Machinery and Concord

Boats were total acquisitions or mergers that resulted in a single remaining company after the

acquisition or merger.  Refusing to apply the continuing violation doctrine to an alleged

conspiracy to enter into a transaction that results in only one remaining company is intuitively

well founded given that more than one party is needed for a conspiracy to continue.  The

transaction between SuperValu and C&S is of a fundamentally different character, as both

companies continued to conduct business after the transaction.  That SuperValu and C&S

---

[3] As Judge Gibson observed in Midwestern Machinery, whether the distinctive
use—distinctive in the sense that it is not inherent in the acquisition itself—is viewed as a
"continuing violation or a different holding and use, the idea is the same" in terms of the
implications for statute of limitations issues.  392 F.3d at 281 n.15 (Gibson, J, dissenting).

exchanged assets as part of their alleged allocation conspiracy does not change the analysis. Had SuperValu and C&S agreed not to compete in their home markets without first exchanging assets, the subsequent charging of supra-competitive prices undoubtedly would constitute new and independent acts that restart the statute of limitations. No principled reason supports distinguishing the subsequent charging of supra-competitive prices merely because the parties exchanged facilities as part of the execution of the alleged allocation conspiracy.

Third, even if it were appropriate to consider the transaction between C&S and SuperValu as equivalent to a merger or total acquisition, Defendants' position regarding the statute of limitations and the continuing violation doctrine fails to recognize the distinction between a competitor lawsuit and a purchaser lawsuit. In the context of monopolization and predatory pricing, Professors Areeda and Hovencamp comment:

> Customers of the monopolist are not injured until after the monopolist causes them injury through higher prices, which may occur later than the exclusionary practices creating the monopoly. For example, competitors are injured immediately by predatory pricing, but customers would not be injured until much later, when the predation has done its work and the monopolist raises its price. Once customers have reason to know of the violation and their damages are sufficiently ascertainable to justify an antitrust action, the statute begins to run against them.

Areeda, supra, ¶ 320c4. This rationale also is applicable to the transaction here. The competitors of SuperValu and C&S were injured (if at all and if of a nature to confer antitrust standing) as soon as the conspiracy was effectuated, and, thus, the statute of limitations on an action by such competitors began to run immediately. However, customers, including Plaintiffs, would not be injured until later, when Defendants used their newly-acquired market power to charge supra-competitive prices.

In sum, the acts alleged in support of Plaintiffs' claim of a continuing violation are appropriately characterized as new and independent acts that inflicted new and accumulating injury rather than unabated, inertial consequences or reaffirmations of a previous conspiracy. Therefore, Plaintiffs are not time barred from asserting claims for injuries caused by supra-competitive prices charged within the limitations period, i.e., in the four years immediately preceding the filing dates of the complaints in these four antitrust actions. See Klehr, 521 U.S. at 189 (holding that the commission of a "separate new overt act" does not permit a plaintiff to recover for the injury caused by old overt acts that do not fall within the limitations period).

### 2. Injury

Defendants next move to dismiss, arguing Plaintiffs have failed to sufficiently allege injury from the non-compete provisions in the AEA. Specifically, it is argued Plaintiffs have failed to allege facts showing that "but for the non-compete provisions, SuperValu would have re-entered New England and C&S would have entered the Midwest." Defs.' Mem. in Supp. of Mot. to Dismiss at 27. Defendants explain that the Complaint reveals that it was "barriers to entry," not the non-compete agreement, that prevented (1) C&S, after it acquired Fleming's Midwest facilities, from entering the Midwest; and (2) SuperValu, after it transferred its New England facilities, from re-entering New England. Id.

The Complaint alleges that (1) the AEA and the non-compete provisions amounted to a market and customer allocation conspiracy, (2) the purpose and effect of that conspiracy was to reduce competition in the Midwest and New England to enable Defendants to charge supra-competitive prices in those markets, and (3) the conspiracy injured Plaintiffs when Defendants took advantage of the ill-gotten increased market power realized through the loss in competition and began charging Plaintiffs supra-competitive prices for wholesale grocery goods and related

15

services.  Compl. ¶¶ 1-3, 34-35, 37-43, 63, 76, 79-82.  Plaintiffs therefore allege an adequate

causal connection between the alleged allocation conspiracy and the claimed injury.

Defendants seemingly argue that the Complaint is inadequate because it fails to rule out

that there are "barriers to entry" that would have existed and prevented C&S from entering the

Midwest and SuperValu from re-entering New England even if Defendants had never entered

into the AEA and the non-compete provisions.  This argument is doubly flawed.  First, if

Plaintiffs' allegations are true, it was Defendants' conspiracy, which included the exiting of the

New England and Midwest markets, that erected barriers preventing C&S from entering the

Midwest and SuperValu from re-entering New England.  Second, Plaintiffs need not rule out,

especially at this early stage of the litigation, other possible causes of their alleged injuries.  See

Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969) (holding that "a

plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of

proving compensable injury under [section 4 of the Clayton Act]").

### 3.       Plausibility

Lastly, Defendants argue that Plaintiffs have failed to allege plausible grounds, as

required by Twombly, to support their claim that the AEA "was a 'sham' designed to disguise a

'secret' market allocation."  Defs.' Mem. in Supp. of Mot. to Dismiss at 28.  The Twombly

"plausibility" standard requires a complaint to plead allegations establishing the elements of the

underlying theory of relief.  See 550 U.S. at 554-56.  Plaintiffs' characterization of the AEA as a

"sham" transaction is not their pleaded *claim for relief* but rather an *evidentiary explanation* of

the alleged purpose of the AEA—to disguise, hide, or make the non-compete provision look less

suspicious from an antitrust perspective.  The claim for relief pleaded in the Complaint is

predicated on an unlawful market and customer allocation conspiracy that resulted in injury to

Plaintiffs, namely, being charged supra-competitive prices.  Plaintiffs have pleaded facts that, if

proven, show a causal connection between the allegedly unlawful conspiracy and their alleged

injuries.  See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (holding that

the dismissal standard established by the Supreme Court in Twombly and Iqbal requires that "the

complaint . . . be read as a whole, not parsed piece by piece to determine whether each

allegation, in isolation, is plausible"); In re Pressure Sensitive Labelstock Antitrust Litig., 566 F.

Supp. 2d 363, 373 (M.D. Pa. 2008) ("Nothing in Twombly . . . contemplates [a]

'dismemberment' approach to assessing the sufficiency of a complaint.  Rather, a district court

must consider a complaint in its entirety without isolating each allegation for individualized

review.").  Dismissal on the ground that Plaintiffs failed to state a claim for relief that is

plausible on its face is denied.

**B.**     **Plaintiffs' Motion for Partial Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the

evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465,

470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but

must demonstrate on the record the existence of specific facts which create a genuine issue for

trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Plaintiffs move for summary judgment on one issue: whether the non-compete provisions in the AEA constitute a per se violation of section 1 of the Sherman Act.[4] Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into what harm it has actually caused." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984); see also United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972) (holding that "[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition" and are "per se violations of the Sherman Act") (quotation omitted) (alterations in original). As the Supreme Court has explained, however, "[o]ther combinations, such as mergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively" and, as such, "are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect." Copperweld, 467 U.S. at 768.

"Resort to per se rules is confined to restraints . . . that would always or almost always tend to restrict competition and decrease output." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007). Only when the challenged conduct is "manifestly

---

[4] If successful on their motion, Plaintiffs will have established the first element of their claims. See Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 883-84 (8th Cir. 1978) (stating that the three elements of a claim under section 1 of the Sherman Act are (1) an agreement, conspiracy, or combination among the defendants in restraint of trade; (2) as a direct and proximate result thereof plaintiffs have been injured in their business and property; and (3) the damages that the plaintiffs sustained are capable of reasonable ascertainment and are not speculative or conjectural).

anticompetitive," <u>Continental T. V., Inc. v. GTE Sylvania, Inc.</u>, 433 U.S. 36, 49-50 (1977), and "lack[s] . . . any redeeming virtue" should it be subjected to per se treatment, <u>Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.</u>, 472 U.S. 284, 289 (1985).

Plaintiffs argue restraints on competition in Defendants' transaction constitute a horizontal[5] allocation of customers and markets or territories subject to the per se rule.[6] Defendants respond that the transaction is not a market/customer allocation but rather some other combination, such as a merger or acquisition, that has the potential for procompetitive efficiencies and is therefore subject to the rule of reason. This dispute presents a question of law for the Court. <u>See</u> <u>In re Cardizem CD Antitrust Litig.</u>, 105 F. Supp. 2d 682, 693 (E.D. Mich. 2000) ("[W]hether to apply a per se or rule or reason mode of analysis in determining the reasonableness of the challenged restraint of trade, is a question of law for the Court.").

In arguing for the applicability of the per se rule, Plaintiffs rely heavily on the Supreme Court's decision in <u>Palmer v. BRG of Georgia, Inc.</u> 498 U.S. 46 (1990) (per curiam). In <u>Palmer</u>, two providers of bar review courses—BRG of Georgia, which provided courses exclusively in Georgia, and HBJ, the Nation's largest provider of bar review courses—entered into an agreement giving BRG an exclusive license to market HBJ's material in Georgia. <u>Id.</u> at 47. The agreement included non-compete provisions that prohibited HBJ from competing with BRG in Georgia and prohibited BRG from competing with HBJ in any state outside of Georgia. <u>Id.</u> The

---

[5] There appears to be no dispute that Defendants compete at the same level of the market, and, thus, any agreement between them would qualify as horizontal. <u>See</u> <u>Bus. Elecs. Corp. v. Sharp Elec. Corp.</u>, 485 U.S. 717, 730 (1988) ("[R]estraints imposed by . . . competitors have traditionally been denominated as horizontal restraints . . . .").

[6] The Court's understanding is that Plaintiffs allege the conspiracy to be both a customer allocation conspiracy and a market or territory allocation conspiracy.

Supreme Court held that the arrangement was a per se violation of section 1 of the Sherman Act, being "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." Id. at 49-50. Plaintiffs argue that the same rationale applies here because Defendants' non-compete provisions effectively reserve the Midwest for SuperValu and New England for C&S.

Any restraint on competition that resulted from the transaction between C&S and SuperValu is different from the market/territorial allocations found per se unlawful in Palmer and many other cases cited by Plaintiffs. Particularly problematic to characterizing the alleged conspiracy in this case as a market or territorial allocation is that the non-compete provisions did not entirely prohibit SuperValu from serving and soliciting *all* customers in the New England region or C&S from serving and soliciting *all* customers in the Midwest region. Rather, they prohibited Defendants from serving and soliciting only the customers in those regions whose supply contracts were exchanged as part of the AEA. Assuming arguendo, as Plaintiffs contend, the exchanged contracts comprised the entirety of SuperValu's New England customers and the entirety of C&S's would-be Midwest customers, nothing in the non-compete provisions prohibited either party from serving or soliciting customers who were being served by other wholesale grocers. Nor did the non-compete provisions prohibit SuperValu from serving or soliciting New England customers who, at the time of the AEA, were being served by C&S. Similarly, the non-compete provisions did not prohibit C&S from serving or soliciting Midwest Customers who, at the time of the AEA, were being served by SuperValu. Finally, the non-compete provisions did not prohibit Defendants from competing over new customers in either market. The transaction between Defendants is not a true allocation of entire markets or territories. See, e.g., Cardizem CD, 105 F. Supp. 2d at 701 (noting, in characterizing an alleged

20

conspiracy as a market/territorial allocation, that the conspiracy "allocate[d] the *entire* U.S. market . . . to [one competitor]") (emphasis added). To the contrary, SuperValu was free to re-enter the New England market to serve or solicit any customer there who was not being served by SuperValu at the time of the AEA, and C&S was free to serve or solicit any customer in the Midwest market who was not being served by Fleming at the time of the AEA.

Plaintiffs argue the harm posed by Defendants' transaction is exacerbated because, unlike the fact pattern in which one company buys all or part of the business of another company and the seller agrees not to compete with the buyer, the transaction here also involved "mutual agreements between competitors not to compete for customers or territories." Pls.' Reply Mem. in Supp. of Mot. for Partial Summ. J. [Docket No. 59] at 7. But "the fact that a market restriction is unilateral rather than bilateral does not determine whether it is naked or ancillary, and unilateral promises can come in both varieties, *just as bilateral promises can*." Areeda, supra, ¶2134d (emphasis added).

The alleged conspiracy is probably more appropriately described as a customer allocation. See United States v. Cooperative Theatres of Ohio, Inc., 845 F.2d 1367, 1372 (6th Cir. 1988) (explaining that "a horizontal agreement between two competitors to refrain from seeking business from each other's existing accounts . . . is plainly a form of customer allocation"). Unlike a market allocation, which, as explained above, requires a restraint on competition affecting the entire market to be thought of as a true "market allocation," it matters not in a customer allocation that the non-compete provisions forbid competition only over the customers who were exchanged and preserves the ability of the conspirators to compete over all other customers in the affected regions. See id. at 1371 (rejecting the argument that an alleged customer allocation conspiracy should not be subjected to per se treatment because it was limited

in scope in that it prohibited the conspirators from actively soliciting only certain customers and preserved competition over other customers); <u>Augusta News Co. v. Hudson News Co.</u>, 269 F.3d 41, 48 (1st Cir. 2001) ("[T]wo competitors may not agree not to compete for customers whether identified individually or by class—for example, that one will serve only customers in Massachusetts while the other will serve only those in Maine.").

Even if the transaction at issue here qualifies as a customer allocation, questions remain as to whether the transaction can avoid per se treatment because the non-compete provisions—the restraint on trade that is the genesis of Plaintiffs' attack on Defendants' transaction—qualify as ancillary restraints. Under the ancillary restraint doctrine, "some agreements [that] restrain competition may be valid if they are subordinate and collateral to another legitimate transaction and necessary to make that transaction effective." <u>Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League</u>, 726 F.2d 1381, 1395 (9th Cir. 1984) (quotation omitted).

> All horizontal restraints are alike in that they eliminate some degree of rivalry between persons or firms who are actual or potential competitors. . . . At one time, . . . the Supreme Court stated . . . that the rule for all horizontal restraints was one of per se illegality. . . . The alternative formulation was that . . . a naked horizontal restraint, one that does not accompany a contract integration, can have no purpose other than restricting output and raising prices, and so is illegal per se; an ancillary horizontal restraint, one that is part of an integration of the economic activities of the parties and appears capable of enhancing the group's efficiency, is to be judged according to its purpose and effect.

<u>Rothery Storage & Van Co. v. Atlas Van Lines, Inc.</u>, 792 F.2d 210, 229 (D.C. Cir. 1986). Thus, "the effect of a finding of ancillarity is to remove the per se label from restraints otherwise falling within that category." <u>Coliseum Comm'n</u>, 726 F.2d at 1395 (quotation omitted).

"Ancillary agreements . . . are agreements that, while horizontal, have the potential to promote competition." Woman's Clinic, Inc. v. St. John's Health Sys., Inc., 252 F. Supp. 2d 857, (W.D. Mo. 2002) (citing Polk Bros. Inc. v. Forest City Entm't, 776 F.2d 185, 189 (7th Cir. 1985)). Such agreements are usually between (1) "the seller of property or business and the buyer not to compete with the buyer in such a way as to detract from the value of the property just sold;" or (2) "the buyer and seller of property or a business not to use the purchased property in competition with the business retained by the seller." Id. (citing United States v. Addyston Pipe & Steel Co., 85 F. 271, 281 (6th Cir. 1898), aff'd as modified by Addyston Pipe & Steel Co. v. United States, 175 U.S. 211 (1899)). Determining whether an agreement is ancillary requires a court to consider whether, at the time the agreement was made, it was necessary to promote the enterprise and productivity of an underlying arrangement. Id.

Defendants argue that there are "some plausible procompetitive benefits" resulting from their transaction and that the non-compete provisions in the AEA are reasonably necessary to make that transaction effective. Specifically, Defendants cite as procompetitive benefits that the exchange allowed them to integrate the assets and businesses acquired from each other into their existing operations, consolidate customer volume into existing distribution facilities, and realize a benefit from customer goodwill and the ability to use certain trade names, all which allowed them to achieve "economies of scale and lowering costs" through "increases in throughput, capacity utilization, and overall efficiency." Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. [Docket No. 48] at 17-25.

Although not conceding the procompetitive benefits claimed by Defendants as plausible results from the transaction, Plaintiffs respond that the non-compete provisions were unnecessary and unrelated to the claimed benefits. Plaintiffs argue that the restraint on

competing over customers is not necessary to achieve the efficiency-enhancing benefits claimed by Defendants in the exchange of the warehouses, inventory, and related assets. With regard to the exchanged customers, Plaintiffs argue that Defendants cannot justify the restraint on competing over customers by invoking the value of those customer accounts as assets and insisting that the restraint is necessary to ensure that value is realized.

On the current record, whether the transaction between SuperValu and C&S plausibly achieved procompetitive benefits and whether the non-compete agreements were ancillary to AEA in the sense that they were necessary to protect the value of the assets being exchanged and realize economic integration cannot be resolved on summary judgment. In the context of a transfer of business assets accompanied by a non-compete agreement, "a per se approach does not seem warranted unless the restriction has no integrative prospects whatsoever." Areeda, supra, ¶2134e. Here, if Defendants show, for example, that the acquisition of the distribution facilities and the customer contracts allowed them to serve more retail grocers through fewer, more efficient distribution facilities, there would be a procompetitive benefit to the transaction. And ensuring that the additional customers would continue to be served through those facilities by executing the non-compete provisions seems reasonably necessary to realize the procompetitive benefit of increased efficiency.

The Supreme Court has cautioned:

> [T]he per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason. It should come as no surprise, then, that we have expressed reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.

Leegin, 551 U.S. at 886-87 (citations and quotation omitted).  With these cautionary words in mind, "a departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . formalistic line drawing."  Continental T. V., 433 U.S. at 58-59.  The Court is unaware of any cases that have involved circumstances closely resembling the circumstances surrounding the transaction in this case.  Accordingly, "there is no long experience with . . . [this type of] practice [to conclude] that the practice produces many pernicious results and almost no beneficial ones."  S. Volkswagen, Inc. v. Centrix Fin., LLC, 357 F. Supp. 2d 837, 850 (D. Md. 2005).

Plaintiffs' motion for summary judgment on the issue of whether the non-compete provisions should be subjected to per se unlawful treatment is denied.   The outstanding issues regarding the per se rule and ancillarity discussed above also extinguish Defendants' position that the Court should instead grant them, the non-moving party, a summary judgment ruling that the rule of reason applies.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** Defendants' Motion to Dismiss [Docket No. 24] is **DENIED** and Plaintiffs' Motion for Partial Summary Judgment [Docket No. 28] is **DENIED**.

BY THE COURT:

s/Ann D. Montgomery

_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: July 7, 2010