# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re Wholesale Grocery Products Antitrust Litigation | **MEMORANDUM OPINION AND ORDER** Court File No. 09-MD-2090 ADM/AJB |

This Order Relates to All Actions

---

Richard B. Drubel, Esq., and Kimberly H. Schultz, Esq., Boies, Schiller & Flexner LLP, Hanover, NH; W. Joseph Bruckner, Esq., Elizabeth R. Odette, Esq., and Kristen G. Marttila, Esq., Lockridge Grindal Nauen PLLP, Minneapolis, MN; Daniel A. Kotchen, Esq., and Daniel L. Low, Esq., Kotchen & Low LLP, Washington, DC; Joel C. Meredith, Esq., Meredith & Associates, Philadelphia, PA; and Kevin M. Magnuson, Esq., Kelley, Wolter & Scott, PA, Minneapolis, MN, on behalf of Plaintiffs.

Stephen P. Safranski, Esq., Martin R. Lueck, Esq., K. Craig Wildfang, Esq., Damien A. Riehl, Esq., Heather M. McElroy, Esq., and E. Casey Beckett, Esq., Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, on behalf of Defendant SuperValu, Inc.

Charles A. Loughlin, Esq., Christopher J. MacAvoy, Esq., and David S. Shotlander, Esq., Baker Botts LLP, Washington, DC; and Todd A. Wind, Esq., and Nicole M. Moen, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Defendant C&S Wholesale Grocers, Inc.

---

## I. INTRODUCTION

On October 31, 2012, the undersigned United States District Judge heard oral argument on Plaintiffs' Motion for Partial Summary Judgment [Docket No. 375]. On November 6, 2012, the undersigned heard oral argument on Plaintiffs' Motion to Defer Consideration under Fed. R. Civ. P. 56(d) [Docket No. 365] and Defendants' Motion for Summary Judgment [Docket No. 353]. Following denial of class certification, In re Wholesale Grocery Prods. Antitrust Litig., 2012 U.S. Dist. LEXIS 103215 (D. Minn. July 16, 2012), D&G, Inc. ("D&G") and DeLuca's Market Corp. ("DeLuca's") now bring their motions individually as the two remaining plaintiffs against Defendants SuperValu, Inc. ("SuperValu") and C&S Wholesale Grocers, Inc. ("C&S"). Also under advisement is Plaintiffs' Request for Leave to File a Revised Motion for Class

Certification [Docket Nos. 420 and 422].  For the reasons set forth below, Plaintiffs' Motion to

Defer Consideration is denied; Defendants' Motion for Summary Judgment is granted; and,

Plaintiffs' Motion for Partial Summary Judgment is denied.  Plaintiffs' request to reopen class

certification is denied as moot.

## II.  BACKGROUND[1]

Plaintiffs D&G and DeLuca's are retail grocers.  They allege Defendants SuperValu and

C&S, two grocery product wholesalers, conspired by way of an Asset Exchange Agreement (the

"AEA") to allocate territory and customers, allowing Defendants to charge Plaintiffs supra-

competitive prices.  2d Consol. Am. Class Action Compl. [Docket No. 99]  ("2d Compl.") ¶¶ 1-

3, 11-12, 31-44.  Plaintiffs allege the conspiracy to allocate territory and customers caused them

to incur damage in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Clayton

Act, 15 U.S.C. § 13.

**A.  Defendants, Full-Line Grocery Wholesalers**

Defendant SuperValu is a Delaware corporation with its principal place of business in

Eden Prairie, Minnesota.  Defendant C&S is a Vermont corporation with its principal place of

business in Keene, New Hampshire.  SuperValu and C&S are full-line grocery wholesalers.

They purchase products directly from consumer goods manufacturers, store the products in

distribution facilities and then resell the products to grocery retailers.  Full-line grocery

---

[1] The factual background of this multi-district litigation has been set forth in length in the Court's previous orders and is not repeated here in full, but rather is incorporated, where necessary, by reference.  In re Wholesale Prods. Antitrust Litig., 2012 U.S. Dist. LEXIS 103215, at *7-13 (D. Minn. July 16, 2012), In re Wholesale Grocery Prods. Antitrust Litig., 2011 U.S. Dist. LEXIS 37670 (D. Minn. Apr. 6, 2011), In re Wholesale Grocery Prods. Antitrust Litig., 722 F. Supp. 2d 1079 (D. Minn. 2010).

wholesalers stock tens of thousands of different products, including produce, meat, dairy products, deli products, bakery items, health and beauty aids, and candy.  2d Compl. ¶ 16.  In addition to supplying grocery products, grocery wholesalers also provide related services such as product transportation, administration, advertising, and brand development.  SuperValu supplies customers including Cub Foods, Albertson's and SuperValu branded grocery stores, along with many other grocers large and small.  Plaintiffs estimate SuperValu supplies approximately 5,000 stores from distribution centers in 21 states.  2d Compl. ¶ 11.  In Minnesota alone, SuperValu competes with the suppliers of Rainbow Foods, Walmart, Target, Costco and Sam's Club.  SuperValu also competes with C&S.  C&S is also a supplier of a large number of grocery stores, including Giant, Safeway, Kroger and A&P.  Plaintiffs estimate that C&S supplies approximately 5,000 stores from distribution centers in 12 states.  Id. ¶ 12.

C&S and SuperValu are the largest full-line wholesalers in the country.  Id. ¶¶ 11-12.  They are not, however, the only full-line wholesalers.  For example, in the Midwest region, other full-line wholesale distributors include Nash Finch Company, Associated Wholesale Grocers ("AWG"),[2] and Certco.  McElroy Decl. Supp. Defs.' Mot. Summ. J. [Docket No. 356] ("McElroy Decl.") Ex. 24, Deposition of Dennis A. Dietrich ("Dietrich Dep.") 127:6-7; 128:19-23; 191:12-14.  In the New England region, C&S competes with Bozzuto's Inc.  Expert Report of John Johnson Related to Class Certification [Docket No. 217] ("Johnson Report") Ex. 9 ("Saia Dep.") 191-92.

Full-line wholesalers are not the sole source of products for retail grocers.  Partial-line

---

[2] In 2003, C&S sold to AWG its warehouses in Lincoln, Nebraska, Memphis and Nashville, Tennessee, and Tulsa, Oklahoma.  Dietrich Dep. 193.

wholesalers provide retailers with a limited set of product categories, such as meat or produce, and require smaller distribution facilities.  Additionally, some retail grocers also purchase organic or local produce, or other specialty brands to meet consumer demand.  Grocery stores cannot always buy these goods through their full-line supplier, and even when they can, partial-line wholesalers or specialty distributors can sometimes offer them more cheaply.  See Section II.D., *infra*.  Additionally, some retailers choose to pool their resources to own and operate a "co-operative" wholesale business.  Dietrich Dep. 30-31.

**B.  Wholesale Grocery Products and Services Pricing**

C&S and SuperValu negotiate with each grocery store, attempting to match profitable services and products to the market needs of the grocery store.  Full-line grocery wholesalers compete for retail accounts principally on the basis of price and service.  2d Compl. ¶ 18.  Prices charged by grocery wholesalers to retailer customers include a price for the purchase of a product, transportation fees, fuel surcharges, warehouse fees and other fees.  Id.

**1.  C&S**

C&S does not charge a single set price for products.  Rather, the ultimate price paid by each customer varies.  The starting point for price is the cost to C&S to buy a product from the manufacturer.  See Saia Dep. 38:13-16 (describing use of cost to C&S as starting point for dry grocery products).  C&S then charges a premium to its customers, referred to as an "upcharge."  See id. at 38:17-19 (describing process for dry groceries).  For many products, the upcharge includes the difference between the price paid by C&S to the manufacturer and the wholesale price the manufacturer suggests C&S charge its clients, referred to as the "list price."  Bruckner Aff. in Supp. of Pls.' Supp. of Mot. for Class Certification [Docket No. 325] ("Bruckner Aff."),

Ex. A, 105:16-21.  List prices are established by manufacturers on a national basis.  Safranski

Decl. in Opp. to Pls.' Mot. for Class Certification [Docket No. 279] ("Safranski Decl."), Ex. I,

73:3-7.  For other products that fluctuate more widely and irregularly in prices, such as produce

and meat products, C&S buys the product at variable instant prices.  Id. at 73:25–77:23.  C&S

gives retailers a single quote based on those acquisition prices.  Id.  C&S then assesses an

upcharge for a client using either a per unit basis (e.g., ten cents per case or per pallet) or as a

percentage of an order (e.g., ten percent of the total list prices of the products).  Johnson Report

Ex. 10 at 30:9-20.  These upcharges are individually negotiated with customers.  Saia Dep.

38:19–39:1.  Factoring into the individual negotiations are size of a customer's orders, frequency

of orders, local market conditions, and distance from a customer's store to C&S's distribution

center.  Saia Dep. 43:17-25, 45:8-10.  Finally, C&S negotiates certain price concessions, such as

rebates, with customers.  Saia Dep. 46:4–47:2.

### 2. SuperValu

SuperValu also does not charge any single price for its products and services.  Instead,

SuperValu uses an approach for some customers known as Activity Based Sell ("ABS") pricing.

SuperValu began implementing ABS pricing in Denver in 1995, and expanded it into the

Midwest and other regions from 1998-2000.  Johnson Report Ex. 137 at SV00130800.008.

SuperValu avers ABS pricing allows it to keep prices lower than its competitors because ABS

creates incentives for customers to act cost-effectively.  Johnson Report Ex. 137 at

SV00130800.002.  ABS pricing sells products to retail grocers at each product's actual average

acquisition cost to SuperValu plus certain fees.  Johnson Report Ex. 133 at SV00129374.015–22.

SuperValu assesses two types of fees–operating fees, which account for about eighty-five

percent of sales, and service fees, which account for about fifteen percent of sales.  Id. at

SV00129374.025.

Operating fees are determined based on summation of nine factors, referred to as "fee

drivers": (1) receiving, (2) storage, (3) finance, (4) selecting, (5) loading, (6) customer minimum,

(7) item minimum, (8) overhead, and (9) percent of purchase.  Id. at SV00123374.026.  The

additional fee for each factor typically allows SuperValu to both recoup the cost of the factor and

generate a profit margin.  Id.  Many of the fee drivers are calculated using a set formula;

generally, fees are determined using average costs (including overhead) multiplied by a

customer's number of cases bought, or time stored, or whatever relevant metrics drive costs.  See

id. at SV00129374.027–45 (describing calculations for each fee factor).  Because the factors are

influenced by conditions particular to each distribution center, such as local wage rates or

average cost of storing an item at a particular warehouse, the precise fee amounts vary by

distribution center.  Id. at SV00129374.046.  However, the finance fee and item-minimum fees

for product groups are constant across all distribution centers.  Id. at SV00129374.031,

SV00129374.042.

Service fees, on the other hand, are fixed fees that apply when orders with certain

minimum order requirements are placed more than twenty-one days in advance.  Id. at

SV00129374.050.  Service fees are used only for promotional products, as these are the products

most often ordered in advance.  Id. at SV00129374.047–49.  Service fees are calculated using a

set per-unit charge plus a percentage charge.  Id. at SV00129374.051.  Service fees vary across

product categories and across services.  Id.  Service fees do not vary between distribution

centers.  See id. at SV00129374.051 (listing "current" fees without reference to distribution

6

centers).

Another aspect of ABS pricing is the Category Management Allowance Program ("CMAP").  CMAP passes manufacturers' promotional funds to retailers based on the performance of certain conditions, such as keeping specific retail prices on an item, putting an item on display, or enrolling in certain programs.  Johnson Report Ex. 2 ("Chew Dep.") 168:4–169:10.  Some of SuperValu's customers use many CMAP promotions, others use some, still others use none.  Id. at 169:11-17.

Not every customer of SuperValu buys products under the ABS pricing regime.  Some larger retailers such as Target and Shopko negotiate contracts with prices determined without ABS pricing.  Johnson Report Exs. 141 (Shopko), 180 (Target).  Retailers may also negotiate credits to offset ABS fees.  Decl. of Michael Oase [Docket No. 222] ¶ 23.  Moreover, ABS pricing does not apply to every product sold by SuperValu.  ABS pricing is used only for the dry grocery, general merchandise, dairy, and frozen product categories.  Johnson Report ¶ 33.

## C.  The Asset Exchange Agreement

Plaintiffs' antitrust claims stem from events that transpired after Fleming Companies, another wholesale grocer, filed for bankruptcy in 2003.  2d Compl. ¶ 26.  In July of that year, C&S agreed to purchase Fleming's wholesale grocery operations, including three distribution facilities in the Midwest.  Id. ¶¶ 27-28.  Shortly after the purchase, C&S and SuperValu began negotiating an asset transfer.  See Beckett Decl. Supp. Mot. Dismiss [Docket No. 26] ("Beckett Decl."), Ex. C; Bruckner Aff. [Docket No. 30] Ex. B (AEA).  On September 6, 2003, Defendants entered into the AEA, under which C&S transferred to SuperValu the recently acquired Fleming's Midwest operations, which included three operating distribution facilities, retail

supply agreements, notes, leases, franchise agreements and customer goodwill, and SuperValu transferred to C&S its New England operations, which included three operating distribution facilities, a distribution facility SuperValu had closed in 2001, retail supply agreements, notes, leases, franchise agreements and customer goodwill.  AEA §§ 1.1, 1.3; Bruckner Aff. Exs. B-1, B-3.  At the time of the asset transfer, SuperValu had been competing against C&S in New England for several years, but C&S had not been competing against SuperValu in the Midwest. Pls.' Mem. in Supp. of Mot. for Partial Summ. J. [Docket No. 29] at 3.

The Agreement also included non-compete provisions.  C&S agreed: (1) not to enter into a supply agreement or other arrangement to supply product to any of the *Fleming customers it was transferring to SuperValu* for the two years following the closing date of the AEA; and (2) not to solicit any of *those Fleming customers* for the five years following the closing of the AEA. AEA §§ 5.8(a), 3.11.  SuperValu made a reciprocal promise not to compete for the *customers* served by the New England operations *it was transferring to C&S*.  Id. §§ 4.9, 6.2.  The former Fleming facilities in the Midwest acquired by SuperValu were closed shortly after the execution of the AEA, and C&S closed the New England facilities it had acquired from SuperValu in the spring of 2004.  Compl. ¶¶ 1, 37; Beckett Decl. Ex. I; Bruckner Aff. Ex. G.

Plaintiffs allege the purpose of the AEA was to allocate customers and territory in violation of federal antitrust laws.  2d Compl. ¶¶ 1-3, 33, 76-83.  Plaintiffs aver the elimination of competition between SuperValu and C&S in regional markets allowed each to charge supra-competitive prices to retail customers.  Id. ¶ 39.

## D.  D&G

Plaintiff D&G, owned by Dennis Dietrich, operates Gary's Foods, a grocery store near

Cedar Rapids, Iowa.  D&G is in direct competition with other stores selling grocery products,

such as Wal-Mart, Target, Hy-vee, ALDI's, and Fareway.  Dietrich Dep. 28:8-9.  D&G used

SuperValu as its primary wholesale grocery supplier from 1971 until August 2005.  Id. at 27:5-6,

264:20-23.  D&G was supplied by a SuperValu distribution center in Des Moines, Iowa until it

closed in April 2002.  Id. at 118:2-6.  From April 2002 until January 2004, SuperValu supplied

D&G from a distribution center in Hopkins, Minnesota.  Id. at 118:7-8.  In January 2004,

SuperValu honored a request from D&G to supply D&G from its Champaign, Illinois facility.

Id. at 212-213.

In the late 1990s, SuperValu added D&G to its ABS pricing system.  Id. at 172.  D&G

complained about the system change numerous times, but did not shop for an alternative

wholesaler until 2003.  Id. at 172-73, 197.  D&G's ordering process from SuperValu, as

explained by Dietrich is as follows.  Every item in SuperValu's warehouse has an "order code,"

a barcode that corresponds to the items on D&G's shelves.  Id. at 45:12-20.  D&G ordered what

it needed to keep its shelves stocked based upon its analysis of inventory levels.  Id. at

45:21–46:4.  For items like produce, where the price changed frequently, D&G received weekly

"order guides" from SuperValu.  Id. at 46:13-22.  D&G also received order guides from Nash

Finch and secondary produce distributors.  Id.  D&G was not obligated to buy exclusively from

SuperValu and chose its suppliers from week to week based on price, quality, and its analysis of

its customers' preferences.  Id. at 47:2-25.  For example, D&G often used a local distributor to

purchase specific produce.  Id. at 47:21-25.  Plaintiffs' expert witness Dr. Jeffrey Leitzinger

reported, "D&G used various suppliers in addition to SuperValu to provide the full range of

products offered in its stores."  Aff. Leitzinger in Supp. Pls.' Opp. to Mot. Summ. J. [Docket No.

371] ("Leitzinger Aff.") ¶ 4.

After SuperValu closed its Des Moines distribution center in 2002, SuperValu supplied D&G from Hopkins, Minnesota, providing a transportation subsidy to help offset the price increase caused by the distance. Dietrich Dep. 146-47. D&G found that despite the transportation subsidy, its fees and transportation costs still increased and the "relationship with SuperValu deteriorated." Id. at 102, 148. D&G described its relationship with SuperValu as a "marriage." The signing at D&G's store read, "Gary's SuperValu"; SuperValu supplied D&G with a private label, Flavorite; and SuperValu administered D&G's advertising program. Id. at 103. However, D&G's unhappiness with the cost of supplies coming from Hopkins led to its search for other options. In October 2002, D&G asked for a freight and fee comparison between SuperValu's Hopkins, Minnesota and Champaign, Illinois distribution centers. Id. at 190:11-13. SuperValu did not respond satisfactorily to that request. Id. at 190:15-17.

In 2003, D&G started soliciting other wholesalers. D&G asked for and received product catalogs from Certco, and provided information to AWG for a price comparison between AWG and SuperValu. Id. at 191:4-8, 12-14; 197-201. In the summer of 2003, D&G notified SuperValu by letter that it had started to contact other wholesalers to attempt to find lower prices. Id. at 190-91. In September 2003, C&S and SuperValu signed their AEA. See Section II.C., above. In January 2004, D&G again wrote to SuperValu, this time claiming it had a competing offer from Certified Grocers Midwest of Chicago. Dietrich Dep. 205-06. D&G now claims the letter was a "bluff" to get supplied from its preferred SuperValu distribution center in Champaign, Illinois. Id. at 196:9-10. Nevertheless, SuperValu took D&G's interest in Certified Grocers seriously and later that month made the change to supply D&G out of Champaign,

Illinois instead of Hopkins, Minnesota.  Id. at 196, 205-06.  D&G states that the change to the

Champaign distribution center saved it about $1,700 per week in fees.  Id. at 222, 246.

Even after SuperValu changed D&G's distribution center, D&G continued to entertain

new wholesale offers, receiving proposals from Nash Finch in May and June of 2005.  Id. at 248.

D&G was also aware of the Fleming distribution center in LaCrosse, Wisconsin, but did not

contact Fleming because Fleming was in bankruptcy proceedings.  Id. at 191:17-23.  D&G

alleges that (1) if C&S had not relinquished to SuperValu its interest in Fleming, and (2) if C&S

had kept the LaCrosse distribution center open, and (3) if C&S had looked for new customers in

Iowa, then D&G would have had another, better priced alternative to SuperValu.  At the very

least, D&G argues it could have used C&S's entry into the market as leverage to force

SuperValu to lower its fees.  Id. at 192:10-14.

D&G's contractual agreements with SuperValu were essentially at-will; that is, D&G

could have switched to a new supplier at any time after giving SuperValu seven days' notice.  Id.

at 143.  D&G also had no minimum purchase requirements with SuperValu.  Id.  D&G avers that

SuperValu's ABS pricing formula, see above, Section II.B.2, was not a good fit for its stores

because D&G did not have the storage or warehouse capacity to either take advantage of ABS's

lower fees for higher quantity ordering or the lower fees for 21-day advanced ordering.  Id. at

150-51, 167-69.  After giving notice, D&G switched to wholesale supplier Nash Finch on

August 21, 2005.  Id. at 174, 264.  D&G later joined AWG in a wholesale grocery co-op.  Id. at

30-31.

## E.    DeLuca's

Plaintiff DeLuca's background with wholesale grocers is less complex.  DeLuca's owns

and operates two small specialty food and wine shops in Boston, Massachusetts.  2d Compl. ¶ 7.

Virgil Aiello, owner of DeLuca's, sets the stores' prices and negotiates with the wholesale

suppliers.  Although the Court was not provided with any documentation of the time frame,

Aiello recalled, DeLuca's was originally supplied by a company owned by Al Oppenheim.

McElroy Decl. [Docket No. 356] Ex. 45, Deposition of Virgil Joseph Aiello ("Aiello Dep.") 61-

62.  Aiello recalled that Oppenheim built a warehouse in Andover, Massachusetts, from which

he supplied DeLuca's.  Id.  SuperValu purchased Oppenheim's business and DeLuca's continued

to be supplied from the same warehouse.  Id.

DeLuca's two stores in Boston are on Charles Street and on Newbury Street.  In 2003,

SuperValu began refusing to deliver to the Newbury Street store.  Aiello Dep. 84.  DeLuca's

response was to supply the Newbury store by ordering from partial-line wholesalers and by

having extra supplies delivered to their Charles Street store.  DeLuca's then used its own trucks

to deliver items to Newbury Street.  Id. at 85.  In May 2003, SuperValu increased DeLuca's

upcharge rate to 7.5% for a total combined fee of 9% including freight fees.  Id. at 78.  Aiello

testified he did not consider leaving SuperValu at that time because SuperValu was the "only

full-line" wholesaler he knew.  Id. at 79.  SuperValu also had the products Aiello needed and he

was confident he could "work out" the problem with the fee.  Id.  However, Aiello knew about at

least one other supplier in the area, Associated Grocers of New England.  Id. at 80.  After months

of negotiation, SuperValu agreed to an upcharge of rate of between 4.5% and 4.75% plus freight.

Id. at 271; Pl.'s Opp. to Summ. J. at 7-8; see also Odette Aff. [Docket No. 372] Ex. 5 (June 5,

2003 e-mail from SuperValu New England to SuperValu Home Office to make a fixed fee

adjustment for DeLuca's to 4.75%).  Neither party has offered any evidence that DeLuca's

12

negotiated upcharge rate was ever implemented.

When SuperValu and C&S signed the AEA in September 2003, C&S became DeLuca's supplier. C&S supplied DeLuca's from the Andover warehouse in November 2003, but closed the warehouse by February 2004. Id. at 138-40. Although C&S translated SuperValu's pricing into its own pricing system, C&S charged DeLuca's a 7.5% upcharge rate (which included freight charges). Pls.' Opp. Summ. J. at 7-8; Defs.' Supp. Summ. J. at 11. Whether C&S was aware of the planned rate change or not, C&S never lowered DeLuca's upcharge rate to the 4.75% negotiated with SuperValu. After the AEA and the closing of the Andover warehouse, C&S drivers sometimes failed to make deliveries or made late deliveries. Aiello's costs thus also increased because of these unreliable product deliveries. Aiello Dep. at 149.

## III. DISCUSSION

### A. Motion to Defer Consideration Under Rule 56(d)

When facts and evidence are unavailable to the plaintiff and the defendant moves for summary judgment, Rule 56(d) of the Federal Rules of Civil Procedure allows the plaintiff to move to defer a decision on summary judgment until the completion of adequate discovery. Janis v. Biesheuvel, 428 F.3d 795, 801 (8th Cir. 2005). If plaintiff, opposing summary judgment, "shows by affidavit or declaration that, for specified reasons, [they] cannot present facts essential to justify its opposition" to summary judgment, then the court may defer considering the summary judgment motion. Fed. R. Civ. Proc. 56(d).[3] "A party invoking [Rule

---

[3] "Note to Subdivision (d). Subdivision (d) carries forward without substantial change the provisions of former subdivision (f). A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment [sic] motion." Notes of Advisory Committee on 2010 amendments.

56(d)'s] protections must do so in good faith by affirmatively demonstrating why he cannot respond to a movant's affidavits as otherwise required . . . and how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." Shqeirat v. U.S. Airways Group, Inc., 645 F. Supp. 2d 765, 794 (D. Minn. 2009) (quoting Willmar Poultry Co. v. Morton-Norwich Prods, Inc., 520 F.2d 289, 297 (8th Cir. 1975)). The Court in Willmar explained that the party opposing summary judgment must show the "knowledge or control of the facts is exclusively or largely" with the party moving for summary judgment. 520 F. Supp. 2d at 294 (adopting 6 J. Moore, Federal Practice § 56.24 at 2876 (2d ed. 1974)). The party seeking delay should also "describe attempts to obtain those facts" it argues are essential. Id.

On September 14, 2012, D&G argued that deferral of consideration is warranted to allow its expert, Dr. Leitzinger, more time to work on "detailed analyses of (i) profit-and-loss statements for the Champaign [distribution center], (ii) SuperValu's transaction data, and (iii) data underlying the calculations of ABS fees." Mem. Supp. Mot. to Defer [Docket No. 367] 3, and Leitzinger Aff. Supp. Motion to Defer [Docket No. 368] ¶ 2.

D&G has not satisfied the requirements of Rule 56(d). D&G has not alleged Defendants have withheld any information. Dr. Leitzinger is not requesting additional information or evidence in the control of Defendants as the reason more time is needed; instead, he has asked for more time to complete his own analysis. Id. Although the parties exchanged a high volume of data during discovery, additional time to analyze facts and marshal data is not the intended objective of Rule 56(d). If analysis time is considered, discovery began in September 2010 and since at least April 2011 D&G has had all the information Dr. Leitzinger alleges he needs,

including profit-and-loss statements, transaction data, and fee drivers. The parties used this same information to take thorough depositions of various witnesses. In addition, D&G and DeLuca's were original plaintiffs in this action. It is expected that Plaintiffs investigated their own claims of antitrust injury and causation before and during their attempts to expand the suit into a class action. The time for discovery has been liberally granted and more time to devise new theories of the case is not the purpose of Rule 56(d).

On September 19, 2012, DeLuca's filed a "Joinder in Support of D&G's Rule 56(d) Motion" [Docket No. 374] requesting that Dr. Leitzinger be granted additional time to determine causation between the alleged antitrust conspiracy and their antitrust injury. DeLuca's attached supporting affidavits from counsel and from Aiello, but nowhere in the affidavits did DeLuca's describe what additional facts or evidence it requires for Dr. Leitzinger's analysis. And Dr. Leitzinger himself did not request any further information about DeLuca's. Nor did he request more time to analyze the data that he already has. DeLuca's has not met the Rule 56(d) standard for deferral of consideration.

**B. Motions for Summary Judgment**

**1. Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall issue "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the court views the evidence in the light

most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the

record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of

Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  After adequate time for discovery, the nonmoving

party must "make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at

322.  Summary judgment for antitrust cases is no different than summary judgment in other

contexts.  Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1490 (8th Cir. 1992).  Where

appropriate, summary judgment serves to dispose of factually unsupported claims.  Id.  Indeed,

the "mere existence" of an alleged factual dispute will not defeat a properly supported motion for

summary judgment.  Anderson, 477 U.S. at 247-48.

### 2. Antitrust Elements

Plaintiffs allege Defendants allocated territory and customers in violation of the Sherman

Act and seek damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  2d Compl. ¶¶ 76-83.

To prevail, Plaintiffs must prove: (1) a violation of antitrust laws, and (2) injury as the result of

the violation.  Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2010).  Under the Sherman

Act, 15 U.S.C. § 1, it is an antitrust violation to contract or form a conspiracy in restraint of trade

or commerce.  The Supreme Court recently acknowledged that "taken literally," Section 1 has

the potential to cover almost every conceivable contract.  Am. Needle, Inc. v. Nat'l Football

League, 130 S. Ct. 2201, 2208 (2010).  Instead, Section 1 is read to prohibit the unreasonable

restraint of trade.  Bus. Elecs. Corp. v. Sharp Elec. Corp., 485 U.S. 717, 723, 108 (1988); see

also Blomkest Fertilizer, Inc., v. Potash Corp. of Saskatchewan, Inc., 203 F.3d 1028, 1032 (8th

Cir. 2000) (en banc) ("Section 1 prohibits concerted action by two or more parties in the restraint of trade."). Courts inquire into unreasonableness because "[a]n antitrust injury is an 'injury of the type that antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Se. Mo. Hosp. v. C.R. Bard, Inc., 642 F.3d 608, 624 (8th Cir. 2011) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (U.S. 1977)). In addition to the unreasonableness of the restraint on trade, Plaintiffs must prove a causal link between their injury and Defendants' illegal presence in the market. Brunswick, 429 U.S. at 489.

### 3. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs' Motion for Partial Summary Judgment raises an issue already fully addressed in this Court's July 7, 2010 Order. In re Wholesale Grocery Prods. Antitrust Litig., 722 F. Supp. 2d at 1094-95. Plaintiffs again argue that the Court should view the AEA and its non-compete agreements as a "per se" unlawful antitrust violation. Mem. Supp. Pls.' Mot. Partial Summ. J. [Docket No. 377] 12. The development of facts and the law has not changed since the Court's legal analysis of this issue; "per se" analysis is not appropriate for this case and partial summary judgment is denied.

### a. Per Se v. Rule of Reason Review

Depending on the type of restraint at issue, plaintiffs must satisfy the burden established by the "per se" rule or the "rule of reason." Craftsmen Limousine, Inc. v. Ford Motor Co., 491 F.3d 380, 386-87 (8th Cir. 2007), cert. denied, 552 U.S. 1040 (2007). The Eighth Circuit Court of Appeals has found certain types of restraints are "so strongly linked with anti-competitive behavior, and their economic impact so immediately obvious" that the Court presumes

unreasonableness and deems these categories unlawful restraints of trade per se.  Id. at 387

(citing, State Oil Co. v. Khan, 522 U.S. 3, 10 (1997) (reviewing the history of per se restraints

and noting that price fixing and exclusive market allocation have been considered per se); Nat'l

Collegiate Athletic Ass'n v. Bd. of Regents, 468 U.S. 85, 100 (1984)).  The Supreme Court

views the "per se" and "rule of reason" standards as part of a sliding scale and has sometimes

described a third standard between the two, a "quick look" standard.  Cal. Dental Ass'n v. FTC,

526 U.S. 756, 780 (1999).  But "quick look" analysis requires the Court to find the same

"intuitively obvious inference of anti-competitive effect" as is necessary to qualify for a "per se"

analysis.  Id. at 781.  The Eighth Circuit has been cautious in its application of the "per se" and

"quick look" standards, calling the standards "exceptional" occurrences and reserving them for

the most patently anti-competitive restraints.  Craftsmen, 491 F.3d at 386-87.  The Court

recognizes, "[M]ost antitrust claims are analyzed under a rule of reason, according to which the

finder of fact must decide whether the questioned practice imposes an unreasonable restraint on

competition, taking into account a variety of factors, including specific information about the

relevant business, its condition before and after the restraint was imposed, and the restraint's

history, nature, and effect."  Id. (internal quotation and citation omitted).

### b.  Per Se Analysis is Inappropriate

The Court's July 7, 2010 Order addressed the issue of whether the AEA non-compete

provisions are per se unlawful.  In re Wholesale, 722 F. Supp. 2d at 1095.  The court refused to

find the non-compete provisions per se unlawful in part because the non-compete provisions *did

not entirely prohibit competition* between SuperValu and C&S.  Plaintiffs have now tweaked

their argument, asking that the entire AEA be found per se unlawful and have argued in the

alternative for a "quick look" finding of anti-competitive restraint on trade.  "Per se" or "quick look" analysis is appropriate if (1) the AEA falls into one of the Supreme Court's established "per se" categories, or (2) Plaintiffs can show undisputed evidence that the AEA is of a type that the Court finds is presumptively anti-competitive.  Parties do not contend the AEA is a case of price-fixing or monopolization.  The July 7, 2010 Order determined that "per se" analysis was inappropriate because the non-compete provisions *did not exclude* SuperValu and C&S from competing for customers not covered by the AEA.  Id. at 1092.  Plaintiffs' new argument that the entire AEA constitutes a "per se" violation, notwithstanding the non-competition agreements, does not solve the problem.  Because the AEA does not prohibit SuperValu and C&S from competing for customers not covered by the AEA, SuperValu and C&S did not make an exclusive market allocation.  Therefore, the AEA does not fall into an established "per se" category.

Plaintiffs second avenue to "per se" or "quick look" analysis is proving that the AEA is of a type that is presumptively anti-competitive.  D&G and DeLuca's have not presented undisputed facts that make the AEA presumptively anti-competitive.  In support of their renewed motion for partial summary judgment, Plaintiffs resubmit evidence that C&S and SuperValu exchanged all of their operating distribution facilities and customers, allocating the Midwest region of operations to SuperValu and the Northeast to C&S.  But, as explained in the July 7, 2010 Order,  Defendants could show that the acquisition of distribution facilities would be a pro-competitive benefit to the transaction, allowing customers to be served more efficiently through fewer distribution facilities.  In re Wholesale, 722 F. Supp. 2d  at 1094.  Defendants have now presented such evidence.  In its opposition to this partial summary judgment motion, Defendants

provided affidavits and documentation of SuperValu's and C&S's independent decision-making processes and demonstrated the efficiencies each created by integrating assets acquired in the AEA. Defs.' Opp. to Partial Summ. J. [Docket No. 391] 22-25 (warehouse consolidation efficiencies), 25-28 (C&S's integration of SuperValu distribution centers and its decision to close one C&S distribution center in favor of operating an acquired SuperValu distribution center), 28-31 (SuperValu's integration of Fleming's Midwest Business).

In addition, Plaintiffs argue they can prove the anti-competitive nature of the AEA with undisputed facts. Plaintiffs cite to communications between Defendants, which Plaintiffs claim show that (1) SuperValu intended to close all of the distribution centers it was receiving from C&S, (2) C&S intended to do the same, and (3) the AEA did not make sense if either continued to do business in the other's respective region. Mem. Supp. Pls.' Mot. Partial Summ. J. at 6-7 (citing, Aff. W. Joseph Bruckner Supp. Pls.' Mot. Partial Summ. J. [Docket No. 378] Exs. 2 and 3). Defendants dispute Plaintiffs' interpretation of these communications. Defendants counter that these communications are simply part of negotiations surrounding the scope of the non-competition agreements, not evidence of anti-competition. Defs.' Opp. to Partial Summ. J. [Docket No. 391] 6-7. When considered in context, these communications can be plausibly read as part of AEA negotiations about the value of the assets being exchanged. C&S and SuperValu discussed whether customers supplied by a distribution center in Harrisburg, Pennsylvania would be included in the non-competition and the AEA. Bruckner Aff. Exs. 2 and 3. Considering the efforts by C&S and SuperValu to exchange assets of equal value, a jury could find that C&S and SuperValu were simply protecting pro-competitive integration of their acquired distribution centers and customers.

As stated above, this Court previously found that the AEA does not fall into one of the established "per se" categories.  Defendants have now offered plausible, pro-competitive justifications for pursuing the AEA and the non-compete provisions contained therein, creating a factual dispute which precludes a finding of presumptive anti-competition.  Accordingly, an abbreviated analysis of the AEA's anti-competitive impact under either the "per se" or "quick look" standard is inappropriate.  Craftsmen, 491 F.3d at 388.  Therefore, Plaintiffs' request for partial summary judgment must be denied because they have not established a right to "per se" analysis as a matter of law or identified undisputed evidence that the AEA is presumptively anti-competitive.

### 4.  Defendants' Motion for Summary Judgment

To survive summary judgment, Plaintiffs must show a case theory, supported by facts, which would allow a reasonable jury to find each element of an antitrust violation.  Having rejected "per se" analysis and the intermediate "quick look" standard, the rule of reason is the appropriate standard to analyze Defendants' motion for summary judgment.  Craftsmen, 491 F.3d at 386-87.  "[M]ost antitrust claims are analyzed under a rule of reason, according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  Id. (internal quotation and citation omitted).

In Craftsmen the Eighth Circuit provided a roadmap useful for analyzing Section 1 claims in the context of a summary judgment motion.  See 491 F.3d at 388-89.  First, Plaintiffs must define the relevant market, which "consists of the area in which consumers can practically

seek alternative sources of the product." Id. at 388.  Second, Plaintiffs must show that the AEA

had detrimental effects on competition in the relevant market.  Id.  Detrimental effects are shown

if Plaintiffs can submit evidence of "actual, sustained adverse effects on competition," or by

showing a defendant had the market power "to raise prices above the competitive level without

losing so many sales so rapidly that the price increase is unprofitable and must be rescinded."

Id.  Simple injury is insufficient; the injury must be of the antitrust variety, namely, caused by

the detrimental effects of the defendants' actions on market competition.  Finally, Plaintiffs have

the burden of presenting a theory supported by facts that link their alleged antitrust injury to the

unreasonable restraint.  Brunswick, 429 U.S. at 489.

### a. D&G

For the following reasons, D&G has failed to produce evidence sufficient to allow a

reasonable jury to conclude D&G can satisfy all elements of its burden of proof.

### i. Market Definition

D&G's pleadings and memoranda largely presume that the AEA, and its non-compete

agreement, unreasonably restrained trade.  Plaintiffs claim "[t]he purpose and effect of the AEA

was to completely eliminate competition between SuperValu and C&S in the Midwest and New

England."  Pls.' Opp Mot. Summ. J. [Docket No. 370] 3.  Plaintiffs' claim skips steps in the

analysis.  The rule of reason first requires the plaintiff to define the relevant market with respect

to the area in which "consumers can practically seek alternative sources of the product."

Craftsmen, 491 F.3d at 388.  Focusing on the AEA's effect on competition between SuperValu

and C&S, D&G fails to address the AEA's effect, if any, its effect on competition among

wholesale grocers in the Midwest.

Defendants provided undisputed facts that the Midwestern competitive market included many more wholesalers than just SuperValu and C&S.  After the AEA, SuperValu continued to face stiff competition in the Midwestern market.  Defs.' Supp. Mot. Summ. J. [Docket No. 355] 4.  When C&S sold the Fleming distribution centers and customers to SuperValu, those customers were not bound to continue business with SuperValu.  Id.  Many competitors, such as Nash Finch, pursued Fleming customers in the Midwest and some customers switched providers. Id. at 4-5.  Defendants provided evidence of companies whose businesses grew by supplying former Fleming customers, citing the growth of Nash Finch, Ohio-based American Seaway Foods, and Kentucky-based Laurel Grocery.  Id.  D&G has not provided any evidence to refute this. D&G also has not been able to dispute Defendants' evidence that Midwestern-market customers seeking alternative sources for their products found several other wholesale grocery distributors willing and able to compete for their business.  Id.

Indeed, D&G's own actions before and after the AEA in September 2003 reinforces that D&G was not limited to a market dominated by SuperValu.  D&G did not want to change distributors.  SuperValu had supplied D&G as far back as the 1970s and SuperValu provided far more than just grocery products.  SuperValu provided advertising services, branding, and business efficiencies through electronic coding and linking of products on store shelves to SuperValu's catalog.  As intertwined as the supplier was with the retail grocer, a change in the wholesaler would be expensive and complicated.  After SuperValu closed its distribution center in Des Moines, Iowa, D&G was upset by the cost of SuperValu's decision to supply D&G from Hopkins, Minnesota.  D&G started to shop for a new supplier in 2003, communicating with at least two other wholesalers, Certco and AWG, for price comparisons and product catalogs.  In

January 2004, D&G told SuperValu that it intended to accept a competing offer from Certified Grocers Midwest of Chicago.  In response, SuperValu agreed to lower D&G's costs and honor its wishes to be supplied from the Champaign, Illinois distribution center.  D&G achieved $1,700 per week cost savings from this change after the AEA.  Still, D&G felt it could get an even  better deal.  D&G did not consider Fleming because it was going through bankruptcy at the time, but it did consider AWG and Nash Finch as alternatives.  D&G switched to Nash Finch on August 21, 2005, and later made another switch to AWG, a cooperative that allowed D&G to have a stake in the full-line wholesale supply business.  Whether or not C&S would have been a viable alternative for the Midwestern market but for the AEA, wholesalers clearly had a competitive market with or without C&S between September 2003 and August 2005.  Looking at the properly defined market—the area which consumers can practically seek alternative sources of the product—D&G did not present evidence for a reasonable jury to conclude that practical alternative wholesalers were not available in the Midwestern market.

### ii.  Detrimental Effects

D&G also has not submitted sufficient evidence upon which a reasonable jury could find that D&G met its burden of proof on detrimental effects.  D&G did not submit evidence that SuperValu or C&S had the market power to raise prices above a competitive level without losing customers.  Nor, did D&G submit evidence of actual, sustained adverse effects on competition.  On the issue of market power, D&G rested its argument on Dr. Leitzinger's expert reports, which found that as a result of the AEA, the concentration of wholesale suppliers in the Midwest increased by ten times greater than the amount that Federal Trade Commission and Department of Justice standards "presume[] to be likely to create or enhance market power."  Pls.' Opp Mot.

Summ. J. 5 (citing, Expert Report of Jeffrey J. Leitzinger in Support of Plaintiffs' Motion for

Class Certification ¶¶ 81-88).[4]  But, the creation or enhancement of market power says nothing

about any actual effect on competition.  As the Eighth Circuit noted in <u>Craftsmen</u>, "Any action

that a profit-seeking business takes could increase its market share relative to some other

segment of that market; indeed, most rational businesses actively take such steps at every

available opportunity. Such steps impact competitors, but that alone does not prove an adverse

impact upon the competitive process."  <u>Id.</u>

After the AEA, D&G claims prices and margins increased at SuperValu's Champaign,

Illinois distribution center and decreased in markets where SuperValu and C&S continued to

compete.  Pls.' Opp Mot. Summ. J. 5.  Plaintiffs' expert, Dr. Leitzinger, analyzed the customers'

costs of being supplied by SuperValu from the Champaign, Illinois distribution center.

Leitzinger Aff. Supp. Pls.' Opp. to Mot. Summ. J. ¶¶ 9-11.  He found, "Total ABS fees for all

ABS customers (with the exception of SuperValu's retail affiliates) out of Champaign (as a

percentage of SuperValu's product costs–its 'dead net sell' [DNS]) increased by [.38%] in the

Class Period compared with 2003."  <u>Id.</u> at ¶ 9.  This fact, however, says nothing about the

competitiveness of Plaintiffs' potential alternative suppliers or about Plaintiffs' leverage to

negotiate competitive prices with SuperValu.  Missing from this analysis, and from Dr.

Leitzinger's discussion of SuperValu's improved gross margin, is any discussion of how

competition suffered.  Even assuming an attempt by SuperValu to charge supra-competitive

---

[4]  Before signing the AEA, Defendants submitted it for examination by the Federal Trade Commission and the Antitrust Division of the Department of Justice.  Neither raised any flags before the Hart Scott Rodino Act, 15 U.S.C. § 18a (2006), waiting period expired.  McElroy Decl. Ex. 7.

prices, D&G provides no theory or facts which show actual, sustained adverse effects on competition, or that SuperValu had the market power "to raise prices above the competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded." Craftsmen, 491 F.3d at 388.

Dr. Leitzinger's analysis of D&G is also missing key elements of proof. D&G's costs increased while being supplied from SuperValu's Champaign distribution center between the first quarter of 2004 and the second quarter of 2005, an increase of about .3 percent. Id. at 6, 12. But, even assuming this increase is evidence of supra-competitive pricing, the evidence is not tied to claims of actual, sustained adverse effects on SuperValu's competitiveness vis-a-vis alternative sources of other wholesale products. This proof of increase also ignores undisputed facts. After the AEA, in January 2004, D&G was able to negotiate a change in distribution centers from Hopkins to Champaign, which resulted in lower fees because of reduced transportation costs. And, when still not satisfied with SuperValu's service or pricing, D&G found a competitive alternative supplier by August 2005. Even if the .3 percent increase was an effort by SuperValu to charge supra-competitive prices, D&G's history belies SuperValu's ability to sustain increased prices without losing customers.

D&G assumes that SuperValu and C&S, as the biggest wholesalers in the country, necessarily obtained the market power to charge supra-competitive prices after the AEA. D&G claims SuperValu could force D&G to accept supra-competitive prices because C&S did not enter the market. But D&G has not presented evidence sufficient for a reasonable jury to find an unreasonable restraint on trade or to find D&G suffered detrimental effects from the AEA; therefore, summary judgment is appropriate.

### b. DeLuca's

Before the AEA, DeLuca's paid an upcharge rate of 7.5% plus additional freight fees to SuperValu.  After the AEA, DeLuca's paid C&S an upcharge rate of 7.5% that included freight fees.  DeLuca's claims it was injured because it had negotiated a 4.5% upcharge rate with SuperValu.  Even though that upcharge rate was never honored by SuperValu or C&S, DeLuca's claims it was injured because the AEA removed competition that would have made 4.5% the competitive rate.

DeLuca's may have been injured by the failure of SuperValu to honor a negotiated upcharge rate.  DeLuca's may have been injured if C&S was obligated through the AEA to honor SuperValu's negotiated upcharge rate.  But each of these claims would be contract disputes.  Neither of these alleged injuries, however, has been connected by DeLuca's to the threshold issue of antitrust law: an unreasonable restraint of trade.  Plaintiffs' Opposition to Summary Judgment spends a total of three short paragraphs defending the fact that DeLuca's was injured.  Like D&G, DeLuca's fails to present evidence of the state of competition in the relevant market, or articulate a case theory as to how that market was detrimentally affected by the AEA.  See Pls.' Opp Mot. Summ. J. at 15-16.  Defendants, on the other hand, made undisputed claims that C&S offered lower prices and other financial inducements to prevent customers from jumping to competitors.  Defs.' Supp. Summ. J. 4.  Furthermore, a number of customers switched to other suppliers such as Bozzuto's despite C&S's efforts.  Id. (citing, McElroy Decl. Exs. 15 (list of customers who switched to Bozzuto's from C&S from 2002 to 2008) and 16).  Defendants also presented undisputed evidence that, after C&S started supplying

DeLuca's, DeLuca's upcharge rate held steady at a 7.5% rate, lower than the cumulative rate charged by SuperValu.  Id. at 22-23 (citing, Johnson Report Fig. 12 at 70).  Even though DeLuca's was clearly unsatisfied with the upcharge rate and delivery problems, without evidence that C&S's prices were supra-competitive, summary judgment is appropriate for Defendants.

## C.  Request for Leave to File Revised Motion For Class Certification

Under Rule 23(c)(1)(C) of the Federal Rules of Civil Procedure, district courts may grant leave to alter or amend an order denying class certification before final judgment.  In this case, there is no reason to reconsider class certification order.  Given the lack of evidence of an antitrust injury to D&G and DeLuca's, no narrowing of the class action will remedy this fundamental shortcoming.  Plaintiffs' request to file a revised motion for class certification is denied as moot.

**IV.  CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

    1.    Plaintiffs' Motion to Defer Consideration [Docket No. 365] is **DENIED**;

    2.    Plaintiffs' Motion for Partial Summary Judgment [Docket No. 375] is **DENIED**;

    3.    Defendants' Motion for Summary Judgment [Docket No. 353] is **GRANTED**;

    and,

    4.    Plaintiffs' Request for Leave to File Revised Motion for Class Certification

    [Docket Nos. 420 and 422] is **DENIED** as moot.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**

                          BY THE COURT:


                          _____s/Ann D. Montgomery_____
                          ANN D. MONTGOMERY
                          U.S. DISTRICT JUDGE

Dated:  January 11, 2013.