# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re Wholesale Grocery Products
Antitrust Litigation

This Order Relates to All Actions

**MEMORANDUM OPINION
AND ORDER**
Court File No. 09-MD-2090 ADM/TNL

_____

W. Joseph Bruckner, Esq., and Elizabeth R. Odette, Esq., Lockridge Grindal Nauen PLLP, Minneapolis, MN; Matthew J. Henken, Esq., and Richard B. Drubel, Esq., Boies, Schiller & Flexner LLP, Hanover, NH; and Daniel A. Kotchen, Esq., Kotchen & Low LLP, Washington, DC, on behalf of the Midwest Plaintiffs.

David J. Lender, Esq., Eric Shaun Hochstadt, Esq., and Luna Ngan Barrington, Esq., Weil Gotshal & Manges LLP, New York, NY; and Todd A. Wind, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Defendant C&S Wholesale Grocers, Inc.

Stephen P. Safranski, Esq., Robins Kaplan LLP, Minneapolis, MN, on behalf of Defendant SuperValu, Inc.

_____

## I. INTRODUCTION

On September 6, 2017, the undersigned United States District Judge heard oral argument on Defendants C&S Wholesale Grocers, Inc.'s ("C&S") Motion to Exclude Expert Testimony [Docket No. 790] and Motion for Summary Judgment [Docket No. 809].[1] The Midwest Plaintiffs oppose both Motions. For the reasons set forth below, the Motion to Exclude Expert Testimony is granted in part and denied in part, and the Motion for Summary Judgment is denied.

_____

[1] Defendant SuperValu, Inc. was initially a co-movant on both Motions, but moved to withdraw without prejudice from the Motions after reaching a settlement with the Midwest Plaintiffs. See Stipulation [Docket No. 826]; Omnibus Case Management & Fourth Am. Pretrial Scheduling Order [Docket No. 838] at 3. Therefore, C&S is the only movant in these Motions.

## II. RELEVANT BACKGROUND[2]

This multi-district litigation consolidates the antitrust lawsuits of retail grocers against C&S and SuperValu, Inc. ("SuperValu") (collectively, "Defendants"), the two largest full-line grocery wholesalers in the United States. See Second Consol. Am. Class Action Compl. [Docket No. 99] ("Second Am. Compl.") ¶ 1. The Plaintiff retail grocery stores purchased wholesale grocery products and related services directly from Defendants. Id. ¶¶ 5–7, 9–10. Plaintiffs allege that in 2003, Defendants conspired to allocate customers and territories through an Asset Exchange Agreement ("AEA"), and that Defendants used the allocations to charge retailer grocers supra-competitive prices, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. See id. ¶¶ 34–44, 77–83. Plaintiffs assert their claims as a class action and are suing for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Id. ¶¶ 67–75, 83.

### A. Wholesale Grocery Industry

Grocery wholesalers such as SuperValu and C&S act as "middlemen" in the grocery supply chain, purchasing products from manufacturers, storing those products at distribution centers, and later reselling those products to retail grocers. Expert Report Jeffrey J. Leitzinger, Ph.D., Supp. Pls.' Mot. Class Certification [Docket No. 621] ("Leitzinger Class Report") ¶ 11; Expert Report Dr. John H. Johnson, IV, Related Class Certification [Docket No. 624] ("Johnson

---

[2] The full factual and procedural background is set forth in previous decisions by this Court and the Eighth Circuit and is incorporated by reference. See In re Wholesale Grocery Prods. Antitrust Litig., 850 F.3d 344 (8th Cir. 2017); In re Wholesale Grocery Prods. Antitrust Litig., 849 F.3d 761 (8th Cir. 2017); In re Wholesale Grocery Prods. Antitrust Litig., 752 F.3d 728 (8th Cir. 2014), cert. denied (June 8, 2015); In re Wholesale Grocery Prods. Antitrust Litig., 707 F.3d 917 (8th Cir. 2013); In re Wholesale Grocery Prods. Antitrust Litig., 2016 WL 4697338 (D. Minn. Sept. 9, 2016);; In re Wholesale Grocery Prods. Antitrust Litig., 2012 WL 3031085, at *1-4 (D. Minn. July 25, 2012); In re Wholesale Grocery Prods. Antitrust Litig., 722 F. Supp. 2d 1079 (D. Minn. 2010).

Class Report") ¶ 26. "Full-line" wholesalers such as SuperValu and C&S distribute tens of thousands of products in every product category, whereas "partial line" wholesalers offer a more limited set of product categories. Leitzinger Class Report ¶¶ 40–42; In re Wholesale Grocery Prods. Antitrust Litig., 752 F.3d 728, 729 (8th Cir. 2014), cert. denied 135 S.Ct. 2805 (2015). The large volume purchases by full-line wholesalers result in cost and logistics benefits that are passed from the wholesaler to the retailer in the form of lower prices. Leitzinger Class Report ¶ 11. The Plaintiff grocers require access to a full-line wholesaler to maintain their competitiveness because full-line wholesalers generate economies of scale and also carry the full line of products that Plaintiffs need to sell to their customers. Id. ¶ 46.

**B. New England and Midwest Markets**

SuperValu's business is primarily in the Midwest, and C&S's business is largely concentrated in New England. Second Am. Compl. ¶ 1. Prior to June 2002, SuperValu was C&S's largest competitor in New England, where C&S was the primary wholesaler. Wholesale Grocery, 752 F.3d at 729. C&S did not compete with SuperValu in the Midwest, where SuperValu's main competitor was Fleming Companies ("Fleming"). Id. at 729–30; Leitzinger Class Report ¶ 17.

In 2003, Fleming declared bankruptcy, and C&S announced its intention to acquire Fleming's Midwest wholesale grocery distribution business, which would have resulted in C&S becoming SuperValu's major competitor in the Midwest. Leitzinger Class Report ¶ 17; Wholesale Grocery, 752 F.3d at 730.

**C. Asset Exchange Agreement**

In September 2003, C&S and SuperValu entered into the AEA, which provided that

SuperValu would receive Fleming's Midwestern assets and SuperValu in turn agreed to transfer its New England assets to C&S. Wholesale Grocery, 752 F.3d at 730. The AEA included reciprocal non-compete provisions. Id. Each Defendant agreed not to supply former customers served from a distribution center exchanged in the agreement for two years. Id. Each Defendant also agreed not to solicit those customers for a period of five years. Id.

Plaintiffs filed this antitrust action in 2009, alleging that the purpose of the AEA was to allocate customers and territory and to agree not to compete with each other for the customers and territories they exchanged. Second Am. Compl. ¶¶ 1–3, 33, 76–83. Plaintiffs aver the elimination of competition between SuperValu and C&S in regional markets allowed each Defendant to charge supra-competitive prices to their retail customers. Id. ¶¶ 39–40.

**D. SuperValu's ABS Pricing**

In the Midwest market, SuperValu uses a pricing formula known as "activity based sell" ("ABS") pricing for its dry grocery, general merchandise, dairy, and frozen product categories. See In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090, 2012 WL 3031085, *3 (D. Minn. July 25, 2012) [Docket No. 352]. The ABS pricing system sells products to retail grocers at each product's actual average cost to SuperValu plus two types of fees—operating fees and service fees. Id.

Operating fees consist of SuperValu's costs in filling the customer's order (calculated using nine "fee driver" classifications) plus a margin. Leitzinger Class Report ¶ 19, n.43. Operating fees apply in approximately 85% of ABS sales. Wholesale Grocery, 2012 WL 3031085, at *3. Service fees are fixed fees that apply when orders with sufficient volume requirements are placed far in advance. Expert Rebuttal Report Jeffrey J. Leitzinger, Ph. D.

[Docket No. 637] ("Leitzinger Class Rebuttal")[3] ¶ 14, n.16.  Service fees apply in approximately 15% of ABS sales.  Wholesale Grocery, 2012 WL 3031085, at *3.

Plaintiffs assert that Defendants' alleged conspiracy enabled SuperValu to "ensure[] the continuation of ABS pricing in the Midwest rather than having to engage in aggressive price competition like that which it experienced in competing with C&S in New England . . . .  As a result, retail customers . . . in the Midwest have sustained overcharges in their purchases of grocery wholesale products and services from Defendants."  Second Am. Compl. ¶ 40.

**E.  Class Certification History**

**1.  Certification of Two Broad Midwest and New England Classes Denied**

On October 31, 2011, Plaintiffs moved to certify two broad putative classes:  (1) retailers who purchased products or related services from Defendants in the Midwest market (the "Midwest Class"); and (2) retailers who purchased products or services in the New England market (the "New England Class").[4]  Plaintiff D&G Inc. ("D&G") was the class representative of the Midwest Class, and Plaintiff DeLuca's Corporation ("DeLuca's") was the class representative of the New England Class.  See Pls.' Mot. Class Certification [Docket No. 202] at 1–3.

This Court denied class certification of both proposed classes on July 16, 2012, after determining that Plaintiffs could not show class-wide impact through common evidence.  See

---

[3] The Leitzinger Class Report and Leitzinger Class Rebuttal are collectively referred to as the "Class Certification Reports."

[4] Both classes included a subclass of retailers who were party to an arbitration agreement with a Defendant during the class period (the "Midwest Arbitration Subclass" and the "New England Arbitration Subclass").  Second Am. Comp. ¶ 67.

Wholesale Grocery, 2012 WL 3031085, at *9–17.  The Court found that prices charged to retail grocer customers in the New England Class are individually negotiated and that upcharges vary from customer to customer depending on the size and frequency of a customer's orders, local market conditions, the distance from a customer's store to a C&S distribution center ("DC"), and individually-negotiated price concessions.  Id. at *2.  The Court rejected Plaintiffs' argument that classwide impact could be shown through three methods—the contrary hypothesis test, the variance test, and list prices—because none of the methods could establish that upcharges had uniformly increased for all class members.  Id. at *10–14.

Addressing the Midwest Class, the Court noted that the "formulaic nature" of the ABS pricing method applied by SuperValu to charge customers in the Midwest market made a better case for certification than the New England Class.  Id. at *16.  Nevertheless, the Midwest Class could not prove impact by common evidence because each of SuperValu's DCs across the Midwest inserted different values into the ABS formula, requiring an analysis of each DC's fees and competitive conditions.  Id.

On August 31, 2012, D&G requested leave to move for certification of a narrower Midwest Class of grocers who were charged using ABS pricing and who were supplied by SuperValu's Champaign, Illinois DC.  See Letter, Aug. 31, 2012 [Docket No. 362].[5]  D&G argued that the Champaign DC-based Class would "entirely avoid[] the problems created by different ABS formulas for different distribution centers."  Id. at 1.

On January 11, 2013, the Court granted summary judgment to Defendants.  In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090, 2013 WL 140285 (D. Minn. Jan.

---

[5] DeLuca's made no request to narrow the New England Class.

11, 2013) [Docket No. 427].  Based on the grant of summary judgment to Defendants, the Court

denied as moot D&G's request for renewed class certification of the narrower Midwest Class.

Id. at *15.  D&G appealed both the summary judgment ruling and the denial of certification of

the Midwest Class.  Notice of Appeal [Docket No. 429].[6]

On May 21, 2014, the Eighth Circuit reversed the grant of summary judgment against

D&G, but affirmed the denial of certification of the Midwest Class.  Wholesale Grocery, 752

F.3d at 733–36.  Additionally, the Eighth Circuit vacated the denial of D&G's request for leave

to pursue certification of a narrower class of SuperValu customers in the Midwest who were

supplied by the Champaign, Illinois DC and charged using the ABS pricing formula.  Id. at 736.

The Eighth Circuit stated that "the evidence suggests the ABS fee inputs would be standardized

for this narrow class," and that this Court should "consider, in light of our holding that the

wholesalers are not entitled to summary judgment, whether to certify this class."  Id.

### 2. Five Classes of Midwest Plaintiffs Certified

In March 2016, the Midwest Plaintiffs moved for certification of five litigation classes

consisting of customers who paid ABS fees in all four SuperValu ABS product categories

(grocery, frozen, dairy, and general merchandise) purchased directly from one of four SuperValu

Midwest DCs from December 31, 2004 through September 13, 2008 (the "Class Period").  Pls.'

Mot. Class Cert. [Docket No. 607].[7]

---

[6] DeLuca's did not appeal the summary judgment ruling or the denial of certification of
the New England Class.

[7] The four Midwest DCs are located in (i) Champaign, Illinois; (ii) Green Bay,
Wisconsin; (iii) Hopkins, Minnesota; and (iv) Pleasant Prairie, Wisconsin.  Id.  There are two
classes of customers from the Champaign, Illinois DC.  One consists of Champaign customers
who have an arbitration agreement with SuperValu, while the other consists of Champaign
customers who do not have an arbitration agreement with SuperValu.

### a. Class-Wide Impact: Dr. Leitzinger's Margin Analysis

In support of their renewed request for class certification, the Midwest Plaintiffs presented a three-pronged argument that class-wide impact could be shown with common evidence: <u>first</u>, the Defendants' conspiracy eliminated competition, enabling SuperValu to achieve supra-competitive net margins; <u>second</u>, the supra-competitive margins strongly support the conclusion that SuperValu charged supra-competitive ABS prices; and <u>third</u>, every class member paid supra-competitive ABS prices because every member (i) made purchases in all four ABS product categories and (ii) was charged according to the same ABS formula for the vast majority of its purchases.

In <u>step one</u> of the argument, the Midwest Plaintiffs asserted that after Defendants' alleged agreement not to compete, SuperValu enjoyed net margins at its Midwest Class DCs that were more than three times higher than they would have been but for Defendants' alleged conspiracy.

According to a net margin comparison conducted by the Midwest Plaintiffs' expert, Dr. Jeffrey Leitzinger ("Dr. Leitzinger"), SuperValu's net margins for the Class DCs after the AEA (when SuperValu faced no competition from C&S in the Midwest) were over 5%, whereas its net margins in New England prior to the AEA (where SuperValu formerly competed with C&S) were only 1.7%.

| Distribution Center | Net Margins: Class Period | Net Margins: New England Pre-AEA | Net Margin Difference (Overcharge Amount) |
|---|---|---|---|
| Champaign, IL | 5.3% | 1.7% | 3.5% |
| Green Bay, WI | 5.8% | 1.7% | 4.1% |
| Hopkins, MN | 5.3% | 1.7% | 3.6% |
| Pleasant Prairie, WI | 5.6% | 1.7% | 3.9% |

Leitzinger Class Report ¶ 140. The amount by which the net margins of the Class DCs exceed those of pre-AEA New England is the amount by which SuperValu's ABS fees were allegedly inflated. The Midwest Plaintiffs referred to this amount as the "overcharge amount." Id. ¶ 126.

According to Dr. Leitzinger, the net margin in a given market depends solely on two factors: market demand elasticity and the nature of competition. Id. ¶¶ 126, 137; Leitzinger Class Rebuttal ¶ 103. Dr. Leitzinger opined that because the demand for full-line wholesale groceries did not materially differ between the Class DCs and pre-AEA New England, the differences in net margins are the result of differences in competition. Leitzinger Class Report ¶ 137; Leitzinger Class Rebuttal ¶¶ 93–94. Dr. Leitzinger further opined that pre-AEA New England is an "ideal" competitive benchmark because SuperValu was C&S's closest and largest competitor in that region prior to the AEA, causing the competitive dynamics in pre-AEA New England to be "very similar to those that would have existed in the Midwest but for Defendants' agreement." Leitzinger Class Report ¶ 129.

Step two of the Midwest Plaintiffs' argument asserted that the supra-competitive margins at the Midwest Class DCs necessarily mean that SuperValu's ABS prices at those DCs were also supra-competitive. Collectively, sales of products in ABS categories accounted for over 70% of the Midwest DCs' sales. Id. ¶¶ 52, 141. Based on this volume, Dr. Leitzinger opined that no other category or categories of non-ABS sales were large enough to account for the difference between SuperValu's margins in the Midwest and pre-AEA New England.

Step three of the Midwest Plaintiffs' argument asserted that every member of each DC Class paid supra-competitive prices because every member: (i) bought in all four product categories, and (ii) was charged under the same ABS formula for the vast majority of its

purchases.

**b. Class-Wide Damages:  Dr. Leitzinger's Calculation of Overcharge**

In their renewed request for class certification, the Midwest Plaintiffs also argued that

damages could be proven with common evidence because each individual class member's

overcharge damages can be calculated using a single formula:  multiplying each class member's

ABS purchases from their Class DC by the percentage of price inflation of that DC's ABS

prices.  Pls.' Mem. Supp. Class Certification at 27; Leitzinger Class Report ¶ 155.  Although

some individualized adjustments for customer-specific ABS pricing modifications or off-invoice

discounts would be required for some class members, these individual issues did not overwhelm

the common issues stemming from class members' purchases of products under SuperValu's

largely universal ABS pricing formula.

**c. Certification Granted Based on Formulaic ABS Pricing**

The Court granted the Midwest Plaintiffs' motion, holding that class-wide impact could

be proven using common evidence because for each proposed class, the large majority of every

member's ABS purchases were charged under an ABS operating fee formula that was identical

to other members of that class.  In re Wholesale Grocery Prods. Antitrust Litig., No. 09-2090,

2016 WL 4697338, at *9–13 (D. Minn. Sept. 9, 2016).[8]  Similarly, the Court concluded that

damages could be proven using common evidence because individualized issues did "not

_____

[8] This holding did not apply to ABS service fees.  See id. at *2 (stating that only ABS
operating fees were at issue in the class certification motion); Leitzinger Class Rebuttal ¶ 41
(stating that service fees were not relied upon for conclusion of common impact).  The Court has
previously held in this case that "service fees do not include any anticompetitive price
'premium.'"  Wholesale Grocery, 2012 WL 3031085, at *17.  This is because "service fees are the
same regardless of whether a distribution center was within the Midwest, where
anticompetitive affects are alleged, or in other regions unaffected by the AEA."  Id.  In other
words, "service fees are the same in regions with and without competition."  Id.

overwhelm the common issues stemming from class members' purchases of products under SuperValu's largely universal ABS pricing formula." Id. at *13.

### d. Class Notice

On March 1, 2017, the Court approved the class notice drafted by Midwest Plaintiffs. See Mem. Op. Order [Docket No. 727] Ex. A ("Class Notice"). The Class Notice states that the Midwest Plaintiffs "are asking for damages to recover the alleged overcharges in ABS fees that were paid to Supervalu as a result of Defendants' alleged conspiracy." Class Notice at 4. The Class Notice also states that "[t]he Plaintiffs' claimed overcharge is measured by the percentage difference in allegedly inflated profit margins earned at a given DC as a result of the Defendants' alleged collusion, multiplied by the quantity of ABS fees paid by an individual class member on purchases from that DC." Id.

## F. Dr. Leitzinger's Merits Report

Dr. Leitzinger's Merits Report [Docket No.799] ("Merits Report") incorporates the findings from his Class Certification Reports with one exception. See Merits Report ¶ 2. The Merits Report includes an additional $68 million in overcharges that were not included in the $158 million damage amount specified in Dr. Leitzinger's Class Certification Reports. Id. ¶¶ 5–8. The $68 million in additional overcharges reflects supra-competitive fees charged by SuperValu on non-ABS products and additional supra-competitive fees charged on ABS products. Id. ¶ 8.

Dr. Leitzinger opines that the $158 million figure in his Class Certification Reports only accounts for 70% of the net-margin inflation, and that the actual net margin inflation at the Class DCs shows that the total overcharges on Class member purchases are $226 million. Id. ¶ 7. He

devised a methodology based on market concentration and market power to apportion the additional $68 million in overcharges among ABS and non-ABS purchases.  Id. ¶¶ 9–14.  Based upon this methodology, Dr. Leitzinger concludes that of the additional $68 million in overcharges, $25 million was charged by SuperValu on ABS sales (bringing the total ABS overcharges to $183 million), while approximately $43 million was charged by SuperValu on its sales of non-ABS products to Class members.  Id. ¶ 14, Attach. 5.

## G.  Present Motions

C&S has filed a motion to exclude the expert testimony of Dr. Leitzinger, arguing that his margin analysis is unreliable.  C&S also contends that if Dr. Leitzinger's opinions are not excluded entirely, they should be limited to exclude several damage categories.  Additionally, C&S has filed a motion for summary judgment, arguing that because Dr. Leitzinger's opinions are inadmissible, the Midwest Plaintiffs have no evidence of injury, which is a required element of their antitrust claim.  C&S thus contends it is entitled to judgment as a matter of law.

## III.  DISCUSSION

### A.  **Daubert** Motion

#### 1.  Legal Standard

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

When evaluating the admissibility of expert testimony, a trial court serves as the gatekeeper to ensure that the proffered testimony is reliable and relevant.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).  A trial court has broad discretion in fulfilling its gatekeeping role.  Wagner v. Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006).  The proffered testimony must be useful to the fact-finder, the expert must be qualified, and the proposed evidence must be reliable.  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  The proponent of the expert testimony bears the burden of showing by a preponderance of the evidence that the testimony is admissible. Id.

"[R]ejection of expert testimony is the exception rather than the rule," and expert testimony should be admitted if it "advances the trier of fact's understanding to any degree." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011) (internal quotations and alterations omitted).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001).  Doubts about the usefulness of an expert's testimony should generally be resolved in favor of admissibility.  Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 758 (8th Cir. 2006).

### 2. Analysis

#### a. Reliability

C&S argues that Dr. Leitzinger's margin analysis must be excluded as unreliable because it fails to consider other economic factors that could explain the difference in the post-AEA Midwest and pre-AEA New England margins. C&S raises three challenges to the reliability of Dr. Leitzinger's margin analysis.

#### i. Higher Margins as Evidence of Higher Prices

C&S first argues that SuperValu's higher margins in the post-AEA Midwest as compared to pre-AEA New England are not reliable evidence that the Midwest Plaintiffs paid supra-competitive prices because higher margins may be the result of lower business costs.

In his Class Certification Reports, Dr. Leitzinger asserted that if competition and demand are the same across two markets, differences in costs will be reflected in different prices, rather than different margins. Leitzinger Class Report ¶ 137; Leitzinger Class Rebuttal ¶ 103. According to Dr. Leitzinger, this is because under recognized economic principles, the net margin in a given market depends solely on two factors: market demand elasticity and the nature of competition. Id. Thus, Dr. Leitzinger opined that if C&S had been competing with SuperValu in the Midwest, SuperValu would have lowered its prices and accepted narrower margins to keep from losing customers to C&S.

C&S argues that Dr. Leitzinger's assertions in the Class Reports have since been undermined by his merits deposition testimony. Dr. Leitzinger stated during his merits deposition that margins can increase due to lower business costs, even where prices stay the same or go down. See Leitzinger Dep. Tr., Mar. 3, 2017 [Docket No. 795] ("Leitzinger Merits

Dep.") at 93:25–94:5 ("Q: Can margins go up even if prices stay the same?" A: Yes. Q: And can you give me an example of how that could be? A: Well, one reason could be . . . a decline in the cost of serving a given volume of business."); id. at 94:10–12 ("Q: Can margins go up even if prices go down? A: Yes. Math – certainly, as a mathematical matter, it's possible.").

Dr. Leitzinger also admitted in the deposition that price was not a factor in his net margin calculations, and that ABS fees actually declined during the class period at SuperValu's Midwest DCs. Id. at 104:10–105:13, 183:19–184:1. C&S thus argues that Dr. Leitzinger's deposition testimony establishes that he has no scientific or reliable method for claiming as he did at class certification that differences in SuperValu's costs will be reflected in different prices rather than different margins.

C&S insists that SuperValu's increased margins in the Midwest were due to higher efficiency and lower business costs at its Midwest DCs after the AEA because SuperValu was able to spread its fixed costs over a larger volume of sales. C&S further contends that SuperValu's ABS fees decreased on average during the class period. C&S thus concludes that SuperValu's higher margins in the Midwest are not evidence that SuperValu charged supra-competitive prices.

This argument fails to recognize that had C&S—the only wholesaler in the nation with similar size, scale, and sales volume to SuperValu—been competing head to head with SuperValu in the Midwest, it would have enjoyed similar efficiencies and economies of scale in the Midwest. Thus, price competition would have forced SuperValu to pass its business cost savings on to customers rather than retaining margins in the Midwest that were three times higher than its margins in New England.

Based on these considerations and the economic principles underlying them, Dr. Leitzinger's statement in his deposition that it is mathematically possible for net margins to increase as a result of lower costs without raising prices does not render his net margin analysis unreliable. Additionally, any decrease in ABS prices during the class period is not necessarily fatal to Dr. Leitzinger's margin analysis. A price may be supra-competitive without actually increasing if a competitive price would be lower than the price charged. Wholesale Grocery, 2012 WL 3031085, at *13.

### ii. Competition from Other Wholesalers

C&S next argues that Dr. Leitzinger's opinion is inadmissible because it fails to account for competition from other wholesalers in New England that may have caused SuperValu's lower margins at its New England DCs before the AEA. In his merits deposition, Dr. Leitzinger stated that he did not determine the impact of C&S on SuperValu's margins in New England versus the impact of other competitors on SuperValu's New England margins. Leitzinger Merits Dep. at 112:1–4. C&S concludes from this statement that Dr. Leitzinger failed to take New England competitors into account when performing his benchmark comparison between pre-AEA New England and post-AEA Midwest.

This argument is unavailing because Dr. Leitzinger investigated the competitive conditions in New England, including the sales, capacity and buying power of SuperValu's other competitors. Leitzinger Class Report ¶ 129. Dr. Leitzinger concluded that "the competitive dynamics in New England were very similar to those that would have existed in the Midwest but for Defendants' agreement (albeit with the respective roles of the two Defendants reversed)." Id.

Dr. Leitzinger also measured market concentration in the Midwest using the Herfindahl-

Hirschman Index ("HHI").[9]  Id. ¶¶ 72–73.  The analysis shows that SuperValu's market concentration increased in the Midwest by more than seven times the amount "presumed to be likely to create or enhance market power" under the DOJ's and FJC's established standards.  Id. ¶ 74.[10]  In addition to analyzing the competitive conditions in New England and the Midwest, Dr. Leitzinger also analyzed the following relevant market factors and found no significant differences:  DC size and capacity, product mix, population density, per capita grocery spending and customer size, and time periods.  Id. ¶¶ 130–33; Leitzinger Class Rebuttal ¶¶ 92–94; 105–06. Thus, Dr. Leitzinger's benchmark analysis properly accounts for the impact of relevant market factors, including other competitors.

C&S argues that the competitive landscape was not similar among the regions because one of the major wholesalers competing with SuperValu in the Midwest was facing serious problems, including poor financial results and SEC issues.  See Leitzinger Class Report ¶ 108. This challenge is appropriate fodder for cross examination but is not a sufficient basis for excluding Dr. Leitzinger's margin analysis.

### iii.  Operating Costs

C&S next argues that Dr. Leitzinger's assumption that the entire difference in SuperValu's profit margins between New England and the Midwest is attributable to the lack of

---

[9] Market concentration is typically measured using the Herfindahl-Hirschman Index ("HHI") and is a function of (1) the number, and (2) respective market shares of firms in a given market.  Wholesale Grocery, 752 F.3d at 731 n.1 (citing U.S. Dep't of Justice & Federal Trade Comm'n, Horizontal Merger Guidelines § 5.3 (2010)).

[10] C&S argues that the HHI generates absurd results for SuperValu's Pleasant Prairie DC because it shows that the area around this DC was even more competitive after the AEA than New England was before the AEA.  This argument may be pursued on cross examination but is not sufficient to exclude Dr. Leitzinger's testimony.

competition from C&S fails to account for SuperValu's lower operating costs in the Midwest. Labor costs were lower in the Midwest, and SuperValu's technology at its Midwest DCs was superior to its New England DCs. Moreover, Dr. Leitzinger admitted in his merits deposition that SuperValu's operating costs were higher in New England prior to the AEA than they were in the Midwest after the AEA, and that increased costs could be among the reasons why SuperValu's margins were lower at its New England DCs than its Midwest DCs. Leitzinger Merits Dep. 100:16–101:6; 106:3–10. C&S argues that Dr. Leitzinger's opinions must be excluded because they fail to account for these cost-based reasons for the differences in SuperValu's margins.

However, if C&S had been competing in the Midwest it would have benefitted from some of the same operational cost savings that SuperValu enjoyed in that region, including lower labor costs. Leitzinger Class Rebuttal ¶ 104. Additionally, like SuperValu, C&S also had highly sophisticated technology that reduced operating costs. Leitzinger Class Report ¶ 15 n.27. Thus, if C&S had been competing head to head with SuperValu in the Midwest, to stay competitive SuperValu may have been forced to lower its prices instead of maintaining its high net margins. Leitzinger Class Rebuttal ¶¶ 103, 104. Based on these considerations, the differing operational costs between New England and the Midwest do not impeach Dr. Leitzinger's margin analysis sufficiently to be inadmissible for jury consideration.

Based on the foregoing, the Court concludes that Dr. Leitzinger's margin analysis is supported by sufficiently reliable methodology and facts, and is not "so fundamentally unsupported that it can offer no assistance to the jury." Bonner, 259 F.3d at 929–30. Dr. Leitzinger's benchmark analysis will be admissible at trial, where C&S will be permitted to

challenge Dr. Leitzinger's conclusions through cross examination.

### b. Damages

C&S argues that if Dr. Leitzinger's margin analysis is not excluded, the Court should nevertheless exclude four aspects of his opinion that overinflate the damages calculation.

### i. Overcharges for Non-ABS Sales

In addition to the $158 million damage figure for ABS sales that Dr. Leitzinger calculated in his Class Certification Report, Dr. Leitzinger's Merits Report now includes another $68 million in alleged overcharges that he attributes to sales of ABS and non-ABS products by SuperValu to class members. Merits Report ¶ 7. C&S argues that testimony about non-ABS fees must be excluded because non-ABS purchases are not included in this case. The Court agrees.

Throughout the course of this litigation, the Midwest Plaintiffs' theory of liability has been that the that Defendants' alleged agreement not to compete resulted in overcharges in <u>ABS fees</u>. <u>See</u> Second Am. Compl. ¶ 40 (alleging that agreement not to compete "ensured the continuation of ABS pricing in the Midwest"); Class Notice at 4 (stating that the Midwest Plaintiffs "are asking for damages to recover the alleged overcharges <u>in ABS fees</u> that were paid to Supervalu as a result of Defendants' alleged conspiracy") (emphasis added).

In moving for class certification, the Midwest Plaintiffs "offer[ed] only a single theory of impact—viz., supracompetitive ABS fees paid by each class member resulting from Defendants' agreement not to compete." Pls.' Reply Mem. Supp. Class Certification [Docket No. 635] at 13. Plaintiffs also repeatedly argued that damages could be proven with common evidence because each individual class member's overcharge damages could be calculated using a single formula:

"multiplying each class member's ABS purchases from a class DC by the percentage by which that DC's ABS prices were inflated." Pls.' Mem. Supp. Mot. Class Certification [Docket No. 618] at 27; see also Pls.' Reply Mem. Supp. Class Certification at 13 (describing "Dr. Leitzinger's method of calculating damages" as "multiplying the amount of ABS purchases by the percentage of ABS overcharge for each DC class").[11] Additionally, the class definitions proposed by the Midwest Plaintiffs and certified by the Court do not encompass non-ABS fees; rather, the class definitions are limited to "customers that paid ABS fees on wholesale grocery products in all four SuperValu ABS product categories." Wholesale Grocery, 2016 WL 4697338, at *14–15. Now that this case has advanced beyond the class certification stage, the Midwest Plaintiffs may not change course and expand the case to include non-ABS fees.

Because the Midwest Plaintiffs have repeatedly and expressly limited their theory of liability to supra-competitive ABS pricing in the Midwest, testimony about alleged overcharges on non-ABS purchases will not be allowed.

### ii. Allocation of Non-ABS Purchases to ABS Fees

In his Merits Report, Dr. Leitzinger opines that the overcharge percentages on ABS products would have been be more pronounced than on non-ABS products because ABS products are often supplied only by full-line wholesalers, and the Defendants' alleged conspiracy eliminated SuperValu's largest full-line competitor. Merits Report ¶¶ 10–12. Non-ABS products, on the other hand, are carried by partial-line wholesalers, and SuperValu continued to

---

[11] Unlike ABS fees, which are arrived at using a standardized formula, non-ABS fees are individually negotiated. Wholesale Grocery, 2012 WL 3031085, at *2–3. Thus, it cannot be assumed that every class member's non-ABS fees were inflated or that individual class members' non-ABS overcharges can be calculated using a common formula.

face competition from partial-line suppliers after the AEA.  Id. ¶¶ 11–12.  Dr. Leitzinger thus concludes that the estimate in his Class Certification Report of $158 million for ABS overcharges likely understated the level of overcharges on ABS sales, and that some of the additional $68 million in overcharge damages should be apportioned to ABS purchases.  Id. ¶¶ 7, 11.

To apportion the additional overcharges between ABS and non-ABS sales, Dr. Leitzinger "employ[s] the economic principle that higher market concentration can generally be associated with higher degrees of market power and, ultimately, higher prices."  Id. ¶ 9.  He calculates the increases in market concentration (HHI) for each of the non-ABS product categories (bakery, deli, meat, and produce) at each Class DC, and uses the resulting ratios to determine the expected overcharge for each non-ABS category at each Class DC.  Id. ¶ 13, Attachs. 8, 9a, 9b.  Dr. Leitzinger concludes that of the $68 million in additional overcharges, approximately $43 million is attributable to non-ABS sales, while the remaining $25 million is attributable to ABS sales (bringing the ABS overcharge total to $183 million).  Id. ¶ 14, Attach. 5.

C&S argues that Dr. Leitzinger's apportionment methodology is speculative and unreliable because his market concentration calculations lack foundation.  To determine market concentration for a given product category at a given DC, Dr. Leitzinger assumed that the percentage of non-ABS product category sales to total sales at the DC was equivalent to the percentage of a DC's square footage that was devoted to that product category.  Leitzinger Merits Dep. at 218:12–16.  For example, if produce sales were 7% of sales at a particular DC, Dr. Leitzinger assumed that produce occupied 7% of the total square footage at that DC.  Id. at 219:11–14.

Dr. Leitzinger, however, did not visit any of the DCs to confirm the square footage that he allocated to the product lines was correct.  Id. at 219:15–17; 222:1–3.  This is fatal to Dr. Leitzinger's analysis because his entire market allocation is premised on the correctness of these assumed square foot allocations.  See id. at 230:3–11 ("Q: And your calculation of non-ABS overcharges is premised on the correctness of your square footage calculations, correct? . . .  A: I think so.  At least it – it – it depends on the reasonableness of those allocations.  If those allocations are different, in a material way, so too would be the overcharge calculation – overcharge allocation.").

The Midwest Plaintiffs attempt to revive Dr. Leitzinger's analysis by arguing that the allocation methodology is reliable because according to Section 5.3 of the DOJ's and FTC's Horizontal Merger Guidelines, a firm's capacity is a proper measure of the firm's competitive importance in a homogenous market such as wholesale grocery products and services.  This argument fails to address that Dr. Leitzinger's capacity calculations are entirely speculative and are not supported by actual data.  Because Dr. Leitzinger's methodology for apportioning overcharges among ABS and non-ABS sales is founded on speculative and unverified data, it is not sufficiently reliable under Daubert.  Dr. Leitzinger will not be permitted to testify about ABS fee overcharges allocated from non-ABS purchases.

### iii.  ABS Service Fees

C&S also argues that Dr. Leitzinger improperly included ABS service fees in calculating the Midwest Plaintiffs' alleged overcharges.  In 2012, this Court concluded that "service fees do not vary across distribution centers, [and] are the same regardless of whether a distribution center was within the Midwest, where anticompetitive affects are alleged, or in other regions

unaffected by the AEA.  Therefore, on their face, service fees do not include any anticompetitive price 'premium.'" <u>Wholesale Grocery</u>, 2012 WL 3031085, at *17.  Since 2012, the record regarding service fees has remained unchanged and Dr. Leitzinger has performed no new analyses to justify altering the Court's prior conclusion.  Therefore, Dr. Leitzinger will not be permitted to testify about any alleged overcharges from service fees.

### iv.  Sales to Customers Over 160 Miles from Former Fleming DCs

C&S argues that Dr. Leitzinger's damage calculations improperly include damages for SuperValu customers located more than 160 miles from any former Fleming DC.  C&S notes that Dr. Leitzinger has opined that the distance beyond which DCs in the Midwest could practicably supply customers (the "competitive service radius" or "CSR") is 160 miles.  <u>See</u> Leitzinger Class Certification Report ¶ 64.  C&S contends that according to this logic, grocers who were outside of the 160-mile CSR of the former Fleming DCs would have been outside of C&S's competitive reach and thus could not have been impacted by Defendants' alleged conspiracy.

The Midwest Plaintiffs respond that SuperValu set a single ABS pricing formula for all ABS customers at a given SuperValu DC, and thus all SuperValu DC customers were charged inflated ABS prices, not just those located within the CSR of a former Fleming DC.

C&S insists that had SuperValu been competing with C&S in the Midwest it would not have made economic sense to uniformly lower its ABS pricing for all customers of a given SuperValu DC if the majority of customers from that SuperValu DC were outside of C&S's competitive reach.  For example, if the location of a former Fleming DC would have made that DC a viable competitor for only 20% of the customers of a SuperValu DC, SuperValu may have

23

chosen to keep their prices higher and risk losing that 20% customer base, because maintaining 80% of its business at higher margins would have been more profitable than keeping 100% of its business at lower margins.

These arguments are best tested and explored through cross examination and defense expert testimony. Thus, the Court denies C&S's request to exclude Dr. Leitzinger's damage calculations for ABS customers located more than 160 miles from a former Fleming DC.

## B. Summary Judgment

### 1. Legal Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

### 2. Analysis

To prevail on their claim under Section 4 of the Clayton Act, the Midwest Plaintiffs must prove (1) an antitrust violation, (2) injury, (3) a causal relationship between the violation and the

injury, and (4) the amount of damages.  <u>Concord Boat Corp. v. Brunswick Corp.</u>, 207 F.3d 1039,

1054 (8th Cir. 2000).  C&S argues that the Midwest Plaintiffs' claims fail as a matter of law

because their only evidence on the required element of injury is Dr. Leitzinger's opinion, and

this evidence is inadmissible under <u>Daubert</u> and Rule 702.

C&S' Summary Judgment Motion is contingent upon the success of the Motion to

Exclude Expert Testimony.  Because Dr. Leitzinger's opinion is admissible and raises genuine

issues of material fact on the element of injury, C&S's Motion for Summary Judgment is denied.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Defendant C&S Wholesale Grocer, Inc.'s Motion to Exclude Expert Testimony [Docket
       No. 790] is **GRANTED IN PART** and **DENIED IN PART** as provided above; and

2.    C&S's and Motion for Summary Judgment [Docket No. 809] is **DENIED.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 24, 2017.